George L. Dunlap *et al.*

*v.*

The Chicago, Milwaukee and St. Paul Railway Company.

*Filed at Ottawa, March 31, 1894.—Rehearing denied, October Term, 1894.*

151   409
151   428
151   409
67a   584
151   409
7Ca   553
151   409
177   617
151   409
173   102
151   409
182    65
151   409
93a  1   8
151   409
94a  1489

1. PRACTICE—*leave to plead over, after demurrer is sustained to pleas.* Where the defendant acquiesces in the ruling of the court in sustaining a demurrer to his pleas, and takes leave to plead over, no question can arise in this court as to the sufficiency of such pleas.

2. SAME—*withdrawal of demurrer.* Where, by agreement in open court, a demurrer to a declaration is overruled, and leave granted the defendant to plead, this will in effect be a withdrawal of the demurrer, and the case will stand in the same position as if no demurrer had ever been filed.

3. SAME—*carrying demurrer back.* A demurrer to pleas, though they are bad, will be carried back and sustained to the declaration if it is bad in substance. Judgment will be rendered against the party committing the first error in pleading.

4. WAREHOUSE—*storage of grain—right of owner to keep grain in store.* Where grain is stored in an elevator, the length of time it shall remain depends upon the option of the owner. So long as he sees fit to pay storage, he, no doubt, has the right to let his grain remain in store.

5. SAME—*contract to deliver grain by carrier to warehousemen.* A railway company entered into a written agreement with the plaintiffs, its lessees, who were warehousemen, in relation to the storage of grain, by which the railway company was to deliver grain on the track, in cars, at the plaintiffs' elevators, so far as it could control the same, and that the railway company was entitled to store its grain to at least one million bushels. The eighth section of the contract was as follows: "In consideration of the agreements aforesaid, the said party of the first part (railway company) agrees that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year during the term of this lease" (ten years), and it was there provided that in case the grain should fall short of that amount, the railway company should pay the plaintiffs one cent per bushel on the deficit. The elevators had a storage capacity of 1,100,000 bushels: *Held,* that when five million bushels of grain annually were delivered on the tracks at the elevators, the covenant or agreement was fully complied with, whether the plaintiffs received the same or not.

6.  Under such covenant in the contract, although less than five million bushels of grain may have been received during any one year of the ten, there was no breach, unless there was a failure during the term the lease was to run to make up the deficiency.  The contract does not require five million bushels to be delivered in each year, but only that the delivery shall average that quantity.

7.  SAME — *implied undertaking from an express one.*  Where there is an express covenant on the part of a defendant railway corporation with its lessees, the operators of elevators, that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year of a lease given by the defendant, the law will imply an agreement on the part of the lessees that they will accept and store the grain offered or delivered.  The obligations of the plaintiffs and the defendant are concurrent.

8.  SAME—*breach, how shown.*  Where the defendant, as a guaranty in favor of the plaintiffs, who are warehousemen, covenants that they shall receive at their elevators a certain number of bushels of grain on an average for ten years, it will be incumbent on the plaintiffs to aver in their declaration that they were ready, able and willing to accept and store all grain delivered on the tracks at the elevators for storage, in order to charge defendant with a liability in an action for a breach of the covenant; and the fact that the storage capacity of the elevators at the time grain may have been delivered for storage was insufficient, furnishes no excuse, as the defendant is not responsible for the want of capacity of the elevators.

9.  CONTRACT—*rule of construction.*  A narrow and unreasonable construction should not be placed on the words used in a contract, but in ascertaining what the parties intended, the nature of the business in which they were engaged, their situation, and the purpose of the entire contract, may be considered.  A construction should not be adopted which works a result different from that intended by the parties.   ·

APPEAL from the Appellate Court for the First District; —heard in that court on appeal from the Superior Court of Cook County; the Hon. JAMES GOGGIN, Judge, presiding.

This was an action of covenant, brought by George L. Dunlap *et al.* against The Chicago, Milwaukee & St. Paul Railway Company, on a lease, which was executed on the 18th day of February, 1880, by the railway company, as party of the first part, and Geo. L. Dunlap and others, as parties of the second part.  The 1st, 2d, 3d and 4th clauses of the lease are as follows:

"Witnesseth: 1. The said party of the first part hereby leases, demises and lets, for the period of ten (10) years from the first day of January, 1881, to the said parties of the second part, lots three (3), four (4) and five (5), in block K, of the original town of Chicago, at an annual rental of three thousand, eight hundred and fifty (3,850) dollars, to be paid quarterly, on the first days of January, April, July and October, of each year, together with all taxes and assessments that may be levied upon said premises during the term of said lease.

"2. The said parties of the second part agree to erect, build and construct, on said lots three (3), four (4) and five (5), a grain elevator, of the capacity of seven hundred thousand (700,000) bushels or more during the year 1880, and further agree to complete the same ready for business with all reasonable dispatch, said elevator to be constructed in the usual manner of grain elevators in the City of Chicago, and in all respects to be a first-class elevator, with suitable and proper foundations and machinery, with proper bins for storing different kinds of grain and different grades, and with all the modern improvements and appurtenances of a first-class elevator, for the transaction of the business of receiving, storing and discharging grains, and to be constructed to the satisfaction of the said party of the first part in these respects.

"3. The said party of the first part hereby agrees to lay all necessary tracks, adjacent to said elevator, to connect its railway therewith, for the purpose of delivering grain in cars thereto, and keep the same in repair during the time of this lease, and agrees to deliver on said tracks, in cars, at said elevator, to the parties of the second part, all the grain that may be brought by its railway, consigned to parties in the City of Chicago, so far as the party of the first part can legally control the same, for handling and storage in said elevator.

"4. The said parties of the second part agree to receive, handle and store, said grain, as delivered in the usual manner of handling grain in the City of Chicago, to the extent of the capacity of said elevator, so to be constructed, and, in addition, agree that they will use for the same purpose, so far as their other engagements will allow, the elevator now standing on lots one (1) and two (2) of said block, and that said party of the first part shall at all times be entitled to storage for its grain to the extent of at least one million (1,000,000) bushels. The parties of the second part, with the consent of the party of the first part, may receive grain for storage from other parties, and from river and canal craft; but in case such grain is so received, so as to reduce the capacity of the parties of the second part to accommodate the party of the first part, to the extent of one million (1,000,000) bushels in said elevators, the said parties of the second part agree to furnish storage in other elevators to the party of the first part, to the extent that their capacity is so reduced without expense to the said party of the first part for switching or otherwise."

Section 5 relates to price of storage, and sections 6 and 7 have no special bearing on the question involved in this litigation.

Clause 8 of the contract is as follows:

"8. In consideration of the agreements aforesaid, the said party of the first part agrees that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year during the term of this lease; and, in case it shall fall short of that amount, the said party of the first part agrees to pay to the said parties of the second part one cent per bushel on the amount of such deficiency; settlements to be made at the close of each year; and whenever it shall appear at the close of any year that the total grain received during so much of the term of this lease as shall then have elapsed, does not amount to an average of five million bushels for each year,

the party of the first part shall pay to the parties of the second part one cent per bushel for the amount of such deficiency; but in case it shall afterwards appear that the total amount received up to that time equals or exceeds the average amount of five million bushels per annum, the amount so paid to the parties of the second part shall be refunded, or so much thereof as the receipts of the year shall have exceeded five million bushels, so that the whole amount paid on account of deficiency shall be refunded, should the total receipts for the entire term equal or exceed fifty million bushels in all, or an average of five million bushels for each year."

Clause 10 provides:

"10. It is further mutually agreed, that all line cars for shipments of grain out from the elevators are to have free access over the track of the party of the first part, on as favorable terms as are granted them at the other elevators above mentioned; and further, in case the said party of the first part shall require additional storage exceeding said one million bushels, or the amount that can be furnished by the said parties of the second part, at both the elevators on the lots above described, to-wit: the elevator now standing on lots one and two of block K, and the one to be built, that the party of the first part shall give to the parties of the second part the option of furnishing said storage on the terms herein prescribed."

The amended declaration, filed September 20, 1890, set out the contract *in hœc verba*, and after averring performance of the covenants of the agreement, averred, that "on, to-wit: 1st day of May, 1880, they, the plaintiffs, entered into possession of said lots 3, 4 and 5, of Block K, and ever since have been in possession thereof, rendering unto the said defendant the rentals stipulated in said indenture, at the times therein mentioned, and paid all taxes and assessments levied thereon from thence hitherto.

"The said plaintiffs also aver, that during the year 1880 they erected, built and constructed upon said lots a grain elevator of the capacity of 700,000 bushels, and completed the same ready for business, as required by the terms of said indenture, and that said elevator, as constructed by them, was a first-class elevator, and that it had the foundations, machinery and other appliances and conveniences and modern improvements in said agreement and lease called for, and was constructed to the satisfaction of the defendant.

"The said plaintiffs aver, that from the time when, as aforesaid, the said grain elevator was completed ready for business, they furnished therein, and in the elevator mentioned in said indenture as then standing on lots one (1) and two (2) of said block, and at all times were willing and ready to furnish grain storage for the use of the defendant to the amount agreed by them to be so furnished in said two elevators, and always kept, at the disposal of said defendant, storage capacity to the amount of one million bushels.

"And the plaintiffs further aver, that from the date of the completion of said elevator they have at all times held and reserved for the use of said defendant the one million bushels of storage capacity stipulated for in said agreement, and received, stored and handled in and by means of the storage capacity aforesaid, so set apart and held for the use of said defendant, all the grain tendered to them by the said defendant for storage and handling, which could be received, stored and handled in and by means of the said storage capacity of one million of bushels in the usual manner of handling grain in the City of Chicago; and that in the usual and customary manner of handling grain in the City of Chicago, at the date of said agreement, and for many years prior thereto, it was easily practicable to receive, store and handle grain annually in and by means of an elevator storage capacity of one million bush-

els, a very large amount of grain in excess of said actual storage capacity, to-wit: Five million of bushels of grain and upwards. And the said plaintiffs further aver, that from the date of the completion of the said elevator, as aforesaid, upon said lots 3, 4 and 5, of block K, aforesaid, to-wit: the first day of January, A. D. 1881, up to and until the first day of January, A. D. 1888, the average amount of grain delivered *by said defendant* at said elevators for storage and handling therein and thereby, was less than five million bushels per annum.

"*Breach.* But the said plaintiffs aver that, notwithstanding the said defendant in said indenture of lease and agreement covenanted that the total amount of grain received at said elevators for storage and handling therein, as aforesaid, should be at least five million bushels on an average for each year during the term of said lease, yet the amount of grain received in said elevators during the year 1888, during which year there was kept for the defendant the full storage capacity in said elevators of one million bushels, agreed upon in said indenture, was less than the five million bushels covenanted by the defendant, to be received therein during said year by three million, one hundred and sixteen thousand, five hundred and twenty-one (3,116,521) bushels, by reason of which the defendant, according to the terms of the indenture aforesaid, became and was bound, at the close of said year 1888, to pay to the plaintiffs, for said deficiency for the year 1888, the sum of thirty-one thousand, one hundred and sixty-five dollars and twenty-one cents ($31,165.21).

"*Second Breach.* And for a second breach, the said plaintiffs aver that, notwithstanding the said defendant in said indenture of lease and agreement covenanted that the total amount of grain received at said elevators should be at least five million bushels on an average for each year during the term of said lease, yet the amount of grain received at said elevators during the year 1888, during which

year there was kept for defendant the full storage capacity
in said elevators of one million bushels, agreed upon in said
indenture, and a large part of which was wholly vacant and
unoccupied, was less than the five million bushels cov-
enanted by the defendant, to be received at said elevators
during said year, by three million, one hundred and sixteen
thousand, five hundred and twenty-one (3,116,521) bush-
els, by reason of which the defendant, according to the
terms of the indenture aforesaid, became and was bound,
at the close of said year 1888, to pay to the plaintiffs, for
said deficiency for the year 1888, the sum of thirty-one
thousand, one hundred and sixty-five dollars and twenty-
one cents ($31,165.21).

"And the plaintiffs therefore aver, that the defendant has
not kept its covenants aforesaid, but has broken the same,
and to keep the same with said plaintiffs the said defendant
hath hitherto wholly refused, and still doth refuse, to the
damage of the said plaintiffs, on account of the said breach
of covenant by the defendant, of fifty thousand dollars,
and, therefore, they bring this suit, etc."

On May 28, 1892, the declaration was amended, as fol-
lows :

"And now again come the plaintiffs, by their attorney,
and by leave of court amend the first count of the amended
declaration filed herein on the twentieth day of September,
1890, by adding thereto, and immediately before the final
sentence or paragraph of said count, the matter following :

"And said plaintiffs further aver, that the said plaintiffs,
together with said Jesse Hoyt in his lifetime, and the said
Perry H. Smith in his lifetime, did cause to be carried on
at said two elevators continuously during the year 1881,
and thenceforward until the commencement of this suit,
the business of receiving, storing and discharging grain,
and during said time all grain tendered for storage in said
elevators, so far as the capacity of said elevators would at
the time of any such tender admit, was duly received and

handled therein, and all vacant storage room therein was kept ready to receive grain as offered for storage. Yet the quantity of grain so tendered for storage at said two elevators, in the course of the business aforesaid, from the first day of January, 1881, to the first day of January, 1888, was not greater than an average of five million bushels for each year during said period, whereof the defendant had notice, on, to-wit: the first day of January, 1888, at, to-wit: the county aforesaid. And the quantity of grain tendered, as aforesaid, in the course of said business, for storage in said two elevators, during the year 1888, was less than five million bushels by a large amount, to-wit: by three million, one hundred and sixteen thousand, five hundred and twenty-one (3,116,521) bushels, whereof defendant had notice, on, to-wit: the first day of January, 1889, at, to-wit: the county aforesaid; and though the defendant thereupon and thereby then and there became liable to pay plaintiffs the one cent per bushel on the amount of such deficiency, being the sum of thirty-one thousand, one hundred and sixty-five dollars and twenty-one cents ($31,165.21), yet the defendant hath not paid the same, or any part thereof.

"And the plaintiffs, by leave of court, further amend said declaration, by adding thereto the count following:

"And for that, whereas, heretofore, on, to-wit: the eighteenth day of February, 1880, at Chicago, to-wit: at the county aforesaid, the defendant, as party of the first part, and the plaintiffs, together with Jesse Hoyt, who died before the commencement of this suit, and Perry H. Smith, who died before the commencement of this suit, as party of the second part, in writing made and duly signed, sealed with their respective seals, and delivered their certain other contract, in words and figures as appear in the two writings, recited and set forth at large in the count of this declaration last above amended.

"And thereupon the said plaintiffs, with said Jesse Hoyt, during his lifetime, and the said Perry H. Smith, during his lifetime, did, during the year 1880, cause to be built, on said lots three, four and five, of block K, a grain elevator of the capacity of seven hundred thousand bushels, and did cause the same to be completed ready for business with all reasonable dispatch, and did cause the same to be constructed in the usual manner of grain elevators in Chicago, and in all respects as a first-class elevator, with proper bins for different kinds and grades of grain, and with all modern improvements and appurtenances of a first-class elevator, for the business of receiving, storing and discharging grains, and to the satisfaction of said party of the first part in said respects, and did thereupon, and during the year 1881, and thenceforward to the commencement of this suit, cause to be duly carried on at, in and with said elevator so built as aforesaid, and the elevator on said lots one and two, mentioned in article four of said contract, the business of receiving, storing and discharging grains, and were ready to receive in said elevators all grain that could be received therein, being an average of five million bushels or more per year, and did in all ways keep and perform all the covenants and obligations of said contract by them to be kept and performed.

"But the defendant hath not kept and performed the covenants and obligations by it to be kept and performed pursuant to the contract aforesaid, and for breach thereof plaintiffs aver, that though from the first day of January, 1881, up to the commencement of this suit, all grains offered or tendered for storage at said two elevators were received therein, so far as the capacity of said elevators would, at the time of any such offer or tender, admit, yet the total amount of grain received at said elevators, from the first day of January, 1881, to the first day of January, 1888, did not exceed an average of five million bushels for each year during said period, whereof the defendant had

notice, on, to-wit: the first day of January, 1888, at, to-wit: the place aforesaid, and the total amount of grain received at said elevator, during the year 1888, was less than five million bushels by a large quantity, to-wit: by three million, one hundred and sixteen thousand, five hundred and twenty-one (3,116,521) bushels, whereof the defendant, on, to-wit: the first day of January, 1889, at, to-wit: the place aforesaid, had notice; and the defendant hath not paid the said one cent per bushel on said deficiency, aggregating in the whole thirty-one thousand, one hundred and sixty-five dollars and twenty-one cents ($31,165.21), or any part thereof.

"And for a further breach in this behalf plaintiffs aver, that the total amount of grain offered or tendered for storage at said two elevators, from the first day of January, 1881, to the first day of January, 1888, did not exceed an average of five million bushels for each year during said period, whereof the defendant, on, to-wit; the first day of January, 1888, at, to-wit: the place aforesaid, had notice, and the total amount of grain offered or tendered for storage at said two elevators, during the year 1888, was less than five million bushels by a large quantity, to-wit: by three million, one hundred and sixteen thousand, five hundred and twenty-one (3,116,521) bushels, whereof the defendant, on, to-wit: the first day of January, 1889, at, to-wit: the place aforesaid, had notice; yet the defendant hath not paid the said one cent per bushel on said deficiency, aggregating thirty-one thousand, one hundred and sixty-five dollars and twenty-one cents ($31,165.21), or any part thereof.

"And for a further breach in this behalf plaintiffs aver, that though more than five million bushels of grain could have been received, stored, and discharged, in any one year, at said two elevators, if delivered and ordered out at times which were reasonably opportune, yet the total amount of grain offered or tendered for storage at said two elevators,

from 1st day of January, 1881, to the 1st day of January, 1889, was less than an average of five million bushels for each year during said period by a large quantity, to-wit: by three million, one hundred and sixteen thousand, five hundred and twenty-one (3,116,521) bushels, whereof the defendant, on, to-wit: the 1st day of January, 1889, at to-wit: the place aforesaid, had notice, yet the defendant hath not paid the said one cent per bushel on said deficiency, aggregating thirty-one thousand, one hundred and sixty-five dollars, twenty-one cents ($31,165.21), or any part thereof.

"And so the plaintiffs say, that defendant hath not kept its covenant aforesaid, but hath broken the same, and to keep the same hath hitherto refused, and still doth refuse, to the damage of said plaintiffs of fifty thousand dollars, wherefore they bring their said suit, etc."

On the 13th of June, 1892, a demurrer was interposed to the declaration as last amended; but on July 16th following, the demurrer was, by agreement of the parties, in open court, overruled, and leave given the defendant to plead. On September 2, 1892, the defendant filed two pleas, to which the plaintiffs demurred. The court sustained the demurrer, and upon application granted defendant leave to plead over within ten days. Under this order the defendant filed pleas Nos. 3, 4 and 5. To these pleas, and each of them, the plaintiffs filed a general and special demurrer, which the court, sustained, and the defendant electing to stand by the pleas, the court entered judgment against the defendant for $24,618.73. The defendant appealed to the Appellate Court where the judgment was reversed, and for the purpose of reversing that judgment the plaintiffs appealed to this court.

Messrs. OLIVER & SHOWALTER, for the appellants.

Messrs. EDWIN WALKER and JOHN W. CARY, for the appellee.

Mr. Justice Craig delivered the opinion of the Court:

It will be observed that the court sustained a demurrer to pleas one and two, and no exception was taken to the decision of the court, but the defendant acquiesced in the decision, and obtained leave to plead over; so far, therefore, as these pleas are concerned or the action of the court upon them, no question is presented for our consideration. As will be seen from the statement, a demurrer was filed to the declaration; the opinion of the court, however, was never taken on the demurrer, but, by agreement of the parties made in open court, it was overruled, and leave granted the defendant to plead. This was in effect a withdrawal of the demurrer, and the case stands in the same position as it would if no demurrer had ever been filed to the declaration. When, therefore, the plaintiffs interposed a demurrer to the three pleas filed by the defendant, although the pleas were bad, if the declaration was also bad, under the settled rules of pleading, the demurrer should have been carried back to the declaration, on the principle that judgment will be rendered against the party committing the first error in pleading. The real question, therefore, in this case, is as to the sufficiency of the plaintiffs' declaration. As has been seen, the contract entered into between the parties was set out *in hæc verba* in the declaration. At the time the contract was executed both parties were engaged in a public employment. The plaintiffs were public warehousemen, and owned an elevator for the storage of grain, situated on lots one and two, of the original town of Chicago, and the defendant owned lots three, four and five, in the same block, and was a common carrier. Under the contract the plaintiffs erected an elevator on defendant's lots, with a capacity of 700,000 bushels of grain. This elevator, and the one on lots one and two, owned and used by the plaintiffs when the contract was made, were to be used by the plaintiffs in carrying out the provisions

of the contract entered into by the parties. Under article 4 of the contract, the plaintiffs agreed to receive and store grain as delivered, to the extent of the capacity of the two elevators, and it was also agreed that the defendant should at all times be entitled to storage for its grain, to the extent of 1,000,000 bushels. Under article 3, the defendant agreed to deliver on the tracks, on cars, at the elevators, to plaintiffs, all the grain that may be brought by its railway consigned to parties in Chicago, so far as defendant can legally control the same for handling and storage in the elevators. It is not charged that the defendant failed or refused to deliver at the elevators all the grain shipped over its lines to Chicago, so far as the company could legally control the same, nor is it charged that the defendant refused to tender or deliver to the elevators for storage 1,000,000 bushels of grain, during the year 1888, but on the other hand, the only breach relied upon is a failure of the defendant to observe the covenant contained in article 8, that the stipulated quantity of grain was not annually received by the elevators for storage. In other words, the claim in this case is, that during the year 1888 the plaintiffs failed to receive for storage in their two elevators 5,000,000 bushels of grain, and, in consequence thereof, the defendant, under article 8 of the contract, is liable to pay them one cent per bushel for the amount of the deficiency. It is not claimed, as we understand the argument, that the defendant agreed to deliver in the elevators for storage 5,000,000 bushels of grain annually. Indeed, the only clause of the contract binding the defendant to deliver grain to the elevator is article 3, which, as we have seen, requires the defendant to deliver, on tracks, at the elevator, all grain brought over its railway, so far as the defendant can legally control the same. We find no other provision of the contract binding the defendant itself to deliver grain to the elevator. It was expected that the plaintiffs would receive grain for storage from other parties. In fact, article 4 ex-

pressly provides that the plaintiffs might secure grain for storage from other parties, and from the river and canal craft. It seems, therefore, plain, that so far as the defendant was concerned, it was not contemplated by either party to the contract that it was required by the terms of the contract to deliver grain for storage under article 8. But the question arises, what the parties did intend, or what did they mean by that part of article 8 which reads: "'In consideration of the agreements aforesaid, the said party of the first part agrees that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year, during the term of this lease." The construction placed on the contract by the plaintiffs' counsel is:

"If on the first day of January, 1889, it appeared, *first,* that the total quantity of grain put into said two elevators during the year then closing was less than 5,000,000 bushels by 3,116,521 bushels; *second,* that during the period from January 1, 1881, to January 1, 1888, the total quantity of grain put into said two elevators was not greater than an average of 5,000,000 bushels per year, *or,* which amounts to the same thing, that the total quantity of grain put into said elevators from January 1, 1881, to January 1, 1889, was less, by 3,116,521 bushels, than enough to make an average of 5,000,000 bushels per year; and, *third,* that, during said period of time, plaintiffs duly carried on at, in, and with, said two elevators, the business of receiving, storing, and discharging grain, and were ready to receive in said elevators grain as tendered at said elevators for storage therein, to the extent of the capacity of said elevators—that is to say, were ready during said period to put into said elevators all grain that could be stored therein; —then the railway company became liable to pay plaintiffs one cent per bushel on said shortage, or $31,165.21."

From the foregoing, it seems that plaintiffs understood and claim that article 8 is in the nature of a guarantee on

behalf of the defendant, that the plaintiffs shall do a storage business of 5,000,000 bushels annually, regardless of the capacity of the two elevators. It does not appear from the record what the precise capacity of the two elevators was. But, in a case between the same parties, reported in 149 U. S. 2, involving the same contract, it appeared that the capacity of the two was 1,100,000 bushels. Treating that as correct, in order to do a storage business of 5,000,000 bushels, it would be necessary that the entire grain stored should be moved out over four times during each year. When grain is stored in an elevator, the length of time it shall remain depends upon the option of the owner. So long as he sees fit to pay storage, he no doubt has the right to let his grain remain in store. It would, therefore, be impossible to determine in advance the number of bushels of grain an elevator might be able to handle in any one year. The railway company had no means of knowing how long the owner or shipper of grain might be likely to permit it to remain in the elevator during any one year, and it is unreasonable to suppose that it would, in view of such fact, be willing to enter into a guarantee that the owners would so move their grain that the elevator would be able to handle any definite amount of grain within a given time; and the terms of the covenant do not require a construction which might lead to a result which could never have been anticipated by one of the contracting parties.

Suppose, on the first week of January, 1888, the plaintiffs received in these elevators 1,100,000 bushels of grain, the full amount the two would contain, and the owners concluded to let the grain remain in store during the entire year. Under the construction contended for by plaintiffs, the defendant would be required to pay to the plaintiffs one cent per bushel on 3,900,000 bushels of grain, although over 5,000,000 bushels may have been tendered for storage during that year, and refused by the plaintiffs, for the reason they had no further storage capacity. We are not pre-

pared to adopt a construction of the contract which would lead to such results. The provision in article 8, that the total amount of grain received at said elevators shall be at least five million bushels, can not be regarded as an undertaking on the part of the defendant that five million bushels shall, as a matter of fact, be stored by the plaintiffs in the elevators. The grain may arrive at the elevators or be received at the elevators, and never go into store in the elevators. A narrow and unreasonable construction should not be placed on the word "received," but in ascertaining what the parties intended, the nature of the business in which they were engaged, their situation, and the purpose of the entire contract may be considered, and when this is done, it is manifest that the sole purpose of the covenant in article 8 was that there would be delivered on track at the elevators, by the defendant railway company and other parties, grain in quantity amounting to 5,000,000 bushels annually, and when that was done the covenant was fully complied with. And whether the defendant received the grain in store, or declined to take it in store on account of a want of capacity, or other cause, did not in any manner affect the defendant. When the required amount of grain was delivered on track at the elevators, the liability of the defendant on its covenant was at an end. It had nothing to do with the plaintiffs' ability or inability to store the grain. This, we think, is a fair and reasonable construction of the contract.

If we are correct in the construction of the contract, the only remaining question to be considered is whether the declaration contains averments showing a right of recovery on behalf of the plaintiffs under that contract. As has been seen under article eight, "the parties of the first part agreed that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year during the term of this lease." Under this provision of the contract, although less than five million

bushels may be received during any one year, there would be no breach of the contract, unless there was a failure during the term the lease should run to make up the deficit.

The contract does not require five million bushels to be delivered each year, but only that the delivery during the ten years should average that quantity. The declaration, as amended September 20, 1890, failed to aver that the total receipts of grain at the elevators from all sources, from the 1st day of January, 1881, to the 1st day of January, 1888, was less than the annual average of 5,000,000 bushels, and on account of this deficit, it is conceded in the argument that the declaration was bad. No further allusion will, therefore, be made to that part of the declaration.

We now come to the amendments made to the declaration May 28, 1892. As heretofore seen, the language of article eight is, "In consideration of the agreements aforesaid, the said party of the first part agrees that the total amount of grain received at said elevators shall be at least 5,000,000 bushels on an average for each year during the term of this lease." It will be observed that there is no expressed promise on the part of the plaintiffs to receive the grain in the elevators required by the covenant to be delivered at the elevators. But the only object of the agreement that a certain quantity of grain should be delivered was, that the grain should be stored in the elevator; there was, therefore, an implied agreement on the part of the plaintiffs that the grain delivered, or offered to be delivered, should be accepted and stored; that, in connection with the promise that a certain quantity of grain should be delivered, there was a corresponding promise or agreement that the grain should be accepted and stored. The promise, that a certain quantity of grain should be delivered, and the promise that it should be accepted and stored, are dependent undertakings. The obligation that the grain should be delivered, and the obligation to store, are con-

current.   1 Chit. Pleading, 297; *Perlee* v. *Rose,* 12 John. 209.

In order to show a breach under article eight, it was therefore incumbent on the plaintiffs to aver that they were ready, able and willing to accept and store all grain delivered on the tracks at the elevators for storage, and that a less quantity was delivered, tendered, or offered to be delivered, than required by article eight of the contract. But no such averments will be found in the amended declaration. In the amendment to the first count all that we find in regard to the readiness of the plaintiffs to receive the grain, is the following:   That plaintiffs, from 1881 to the commencement of the suit, were engaged in storing grain, and during said time all grain tendered for storage in said elevators, so far as the capacity of the elevators would at the time admit, was duly received.   The fact that the storage capacity of the elevators at the time grain may have been delivered for storage was all taken, furnishes no excuse.   In order to establish a breach under the contract, it devolved on the plaintiffs to aver a readiness at all times to receive all grain delivered, tendered or offered for storage. By way of further amendment, plaintiffs added May 28, 1892, another count.   But in this count all that will be found in respect to the readiness of the plaintiffs to receive the grain delivered for storage, is the following:   After averring that they were in the business of receiving and storing grain, it is averred, that they were ready to receive in said elevators all grain that could be received therein, being an average of 5,000,000 bushels or more per year. This showed no readiness to receive grain delivered for storage.   They were only ready when storage capacity existed in the warehouse.   But that was a matter with which the defendant had no concern.   The covenant or agreement of the railway company, as contained in article 8, as heretofore seen, was that a certain quantity of grain would be delivered on track for storage at the elevators; but that ar-

ticle contains no guarantee that plaintiffs would have the capacity to store the grain, or any part of it. It is therefore apparent, when the quantity of grain named in the contract was offered to the plaintiffs, the railway company had complied with its part of the contract, and the inability of the plaintiffs to accept the grain for the want of storage capacity, or for any other reason, can not be relied upon to aid them in enforcing a liability against the defendant. The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

---

George Dunlap *et al.* v. Chicago, Milwaukee & St. Paul Railway Co. *Filed at Ottawa, March 31, 1894.* Per Curiam: The questions involved in this case are the same as those involved in the foregoing case, between the same parties, and the decision in that case must control here. Judgment of Appellate Court will be affirmed.

*Judgment affirmed.*