(No. 32431.—

UNITED STATES TRUST COMPANY OF NEW YORK *et al.*, Appellees, *vs.* GWETHALYN JONES *et al.*, Appellants.

*Opinion filed January 22, 1953—Rehearing denied March 24, 1953.*

Wilson & McIlvaine, of Chicago, (J. F. Dammann, Kenneth F. Montgomery, and Peter A. Dammann, of counsel,) for appellants.

Isham, Lincoln & Beale, (Cyrus H. Adams, and George B. Young, of counsel,) all of Chicago, for appellee United States Trust Company; Gardner, Carton & Douglas, (Alfred T. Carton, and James A. Velde, of counsel,) all of Chicago, for appellees Trustees of Princeton University; Carl B. Aplon, of Chicago, guardian *ad litem* for Edward H. Bennett *et al.*, appellees.

Mr. Justice Daily delivered the opinion of the court:

This action was brought in the superior court of Cook County by the trustee of an *inter vivos* trust created in 1916 by David B. Jones, now deceased, of Chicago. The com-

plaint filed seeks directions with respect to whether the income or corpus should be charged with the payment of the Federal tax on certain capital gains.

The trust was created for the benefit of the settlor's five children and their issue, and, by subsequent amendment, the issue of the settlor's brother and Princeton University were made contingent remaindermen. The terms of the trust divided the corpus into five equal funds and the trustee, United States Trust Company of New York, was directed to administer each fund as a separate trust for the benefit of each of the five children. In 1948 the trustee sold 1400 shares of stock, belonging equally to the five funds, at a profit or gain over acquisition price of approximately $300,000. This capital gain was distributed equally to each of the five trusts, increasing the corpus of each by more than $62,000. The Federal tax liability attributable to the capital gain totaled approximately $60,000, or about $12,000 for each of the separate trusts.

Article six of the trust instrument contains the following direction:

"Article Sixth. Out of the income of the principal of the trust estate the Trustee shall pay all taxes, assessments or other governmental charges which it may be required to pay or to retain because or in respect of any part of the principal of the trust estate or the income therefrom or the interest of the Trustee therein or the interest of any beneficiary or other person therein, under any present or future law of the United States, or of any state, county, municipality, or other taxing authority therein, any and all such taxes, assessments or other governmental charges lawfully imposed being charged as a lien upon the said income, and in case of deficiency of said income upon the principal of the trust estate."

The trustee paid the capital gains tax described above, then initiated this action to obtain a judicial determination as to whether the proportionate shares of the tax should

be charged against the income or capital account of each of the five trusts. The chancellor concluded that article sixth compelled a holding that the tax was chargeable to income and not to *corpus*. Following this the income beneficiaries were granted leave to file a counterclaim wherein it was maintained that the construction which charged such taxes to current income would cause an invalid accumulation of income in violation of the act restraining directions in conveyances, etc., commonly known as the Thellusson Act. (Ill. Rev. Stat. 1951, chap. 30, par. 153.) The chancellor also decided this issue against the income beneficiaries, who then appealed to the Appellate Court where the decisions of the chancellor were affirmed. (*United States Trust Co. of New York v. Jones,* 346 Ill. App. 365, 105 N.E. 2d 122.) We have granted leave to appeal to this court, and in the briefs filed here it is only the guardian *ad litem* for minor defendants and trustee for persons not in being who opposes the contentions of the appellants.

It is significant to note at this point that the tax liability on the $300,000 capital gain can be satisfied by the payment of approximately $60,000 if paid out of the corpus in one payment; whereas, if the tax is chargeable to income, it will actually cost each of the five trusts well in excess of $15,000. In the latter case the total cost of satisfying the tax becomes approximately $77,000, or about $17,000 more than it would be if the tax were to be paid outright from the corpus. This incongruous result is due to the intricacies of the Federal income tax law dealing with the taxation of trusts, which, when applied to this case and to payment of the tax from current income, would require the trustee to withhold distribution of income in each of the trusts for 1950 and three years following, until the total tax liability assessed in 1949 has been paid. The amount of income so withheld in each of the years to pay the capital gains tax is not deductible in each year as distributed income in determining the trust's

yearly income tax liability, and accordingly it becomes taxable income upon which the trustee must pay tax. The result is a tax upon a tax and an increase of more than $17,000 in the capital gains tax for the trust entity as a whole. In addition the beneficiaries are deprived of a substantial portion of the income the settlor intended they should have.

A further factor to be considered is that the bulk of the trust corpus is comprised of New Jersey Zinc Company stock which, under the terms of the trust, cannot be sold without the written consent of two of the trust beneficiaries. As income beneficiaries it is not to be expected that they would consent to sale, even though sound business practice motivated the trustee to seek the sale of the stock, when the result of their consent would be to subject themselves to the burden of paying the tax on the fruits of the sale, which do not belong to them, and at the expense of depleting the income they would otherwise enjoy.

It was the stress of these circumstances which prompted the trustee to commence this action for construction and directions, and it is upon these facts that the appellant income beneficiaries ask a reversal of the decisions of the lower courts that the capital gains tax must be paid from current income rather than *corpus*. In the alternative, they urge that if the trust is construed to expressly direct the payment out of income, such direction creates an invalid accumulation of income.

There is little dispute between the parties here or the authorities that, in the absence of express provisions to the contrary, the profits or increments of *corpus* belong to the *corpus* of the trust and are not income. (*DeKoven* v. *Alsop*, 205 Ill. 309; *Vanatta* v. *Carr*, 229 Ill. 47.) The same may be said for the proposition that, barring the presence of explicit trust language directing otherwise, taxes and impositions levied on account of gain realized on capital will be charged against and payable out of capital.

(*Warren* v. *Lower Salt Creek Drainage Dist.* 316 Ill. 345; *Huston* v. *Tribbetts*, 171 Ill. 547; Bogert, Trusts and Trustees, chap. 38, sec. 804, note 71.) Therefore, the tax under consideration here should be paid out of *corpus* unless article six of this trust is construed to direct the payment out of income with such unequivocal clarity as to preclude the application of the general rules set out above.

Before it can be said that no ambiguity exists, we must conclude that the questioned words or language are capable of but one interpretation. Such conclusion must be determined from a consideration of the entire trust instrument and not from a single portion thereof. (*Williams* v. *Swango*, 365 Ill. 549; *Wise* v. *Wouters*, 288 Ill. 29; *Wilkin* v. *Citizens Nat. Bank*, 298 Ill. App. 38, 18 N.E. 2d 251.) Contrary to the decision of the lower courts, we do not believe that the terms of article six, or of the trust instrument as a whole, point with compelling clarity to an intention of the settlor to require the beneficiaries of the distributable income to pay the tax on capital gain which could in no event profit such beneficiaries.

The object of judicial construction of a written instrument is to ascertain the true intent of the parties and to carry it out if it does not conflict with any rule of law, or good morals, or the public policy of the State. (*Olson* v. *Rossetter*, 399 Ill. 232; *Plast* v. *Metropolitan Trust Co.* 401 Ill. 302.) Unfortunately, the law provides no precise scale with which to measure the meaning of words in interpreting written instruments, leaving courts to depend on general rules of construction which look to the manifest intention of the one who uttered the words and to results which avoid the unreasonable and impractical. Even the application of general rules must be tempered by the language used in the particular instrument under consideration. The problem presented is of the sort described by Judge Learned Hand, speaking in *United States* v. *Klinger*, 199 Fed. 2d 645, as follows: "The issue involves the

baffling question which comes up so often in the interpre-
tation of all kinds of writings: how far is it proper to
read the words out of their literal meaning in order to
realize their overriding purpose? * * * When we ask
what * * * [was] 'intended,' usually there can be no
answer, if what we mean is what any person or group of
persons actually had in mind. Flinch as we may, what we
do, and must do, is to project ourselves, as best we can,
into the position of those who uttered the words, and to
impute to them how they would have dealt with the con-
crete occasion."

In construing a written instrument, its letter should be
controlled by its spirit and purpose, bearing in mind that
the terms employed are servants and not masters of an
intent, and are to be interpreted so as to subserve, and not
to subvert, such intent. To this end courts are sometimes
required to restrict the meaning of words. (See, 12 Am.
Jur., Contracts, sec. 236.) A very applicable decision of
this court is *McCoy* v. *Fahrney,* 182 Ill. 60, which involved
the construction of a trust agreement where a man in diffi-
culty conveyed his property to a trustee to pay his debts,
after which the trustee was to pay the annual proceeds of
the land to Elizabeth Ankeney, wife of the settlor, during
her natural lifetime, and after her decease to convey the
lands *to all* the children of the said Elizabeth Ankeney.
The wife subsequently obtained a divorce from the settlor,
married again, and also had children by the second husband.
Though it is obvious that the literal meaning of the words
"all the children of the said Elizabeth Ankeney" would in-
clude children born by the second husband, this court said:
"The word 'all' must, in view of the manifest intention
of the grantor, be so limited in meaning as to refer only
to all of the class of children intended to be benefited by
the instrument." Before making the aforesaid conclusion,
we said: "A narrow and unreasonable construction, and
which would work a result different from that manifestly

intended, should not be adopted. (*Dunlap* v. *Chicago, Milwaukee and St. Paul Railway Co.* 151 Ill. 409.) 'The language used may be enlarged or limited by the attendant circumstances and the objects had in view, and more regard is due to the real intention of the parties than to some particular word that may have been used in the expression of that intention.' (*Chicago, Madison and Northern Railroad Co.* v. *National Elevator Co.* 153 Ill. 70.) 'The experience of human affairs teaches courts that this intention is not to be sought merely in the apparent meaning of the language used, but this language may be enlarged or limited by reference to the circumstances surrounding the parties and the objects they evidently had in view.' (*Robinson* v. *Stow,* 39 Ill. 568.) The same principle is announced in *Street* v. *Chicago Wharfing Co.* 157 Ill. 605. 'Particular expressions will not control where the whole tenor or purpose of the instrument forbids a literal interpretation of the specific words.' "

Looking to the present case in the light of the principles of construction discussed, if it be held that a literal construction of article six would require the payment of the tax on capital gain out of the distributable income, we do not believe such an interpretation should be given the trust agreement. The normal and probable reason for the direction contained in article six was to insure the *corpus* against shrinkage and inroads which would render it less capable of providing an income sufficient to provide for those the settlor sought to immediately benefit. Such a thought prevails over any probability that the settlor would desire the *corpus* to be enlarged for the possible benefit of contingent remaindermen at the expense of his children. Certainly, he did not intend the article to produce a situation where his children's income from the trust would be severely diminished or cut off entirely for a given year or possibly many years. Practicality and rudimentary business practice make it certain that the settlor did not contemplate, desire or

intend a state of affairs whereby his direction would be construed to thrust upon the income beneficiaries the obligation of paying a tax indebtedness of $77,000 which could be satisfied by paying only $60,000 out of another portion of the trust estate. This is especially true in view of the fact that the requirement so construed would benefit the contingent remaindermen at the very definite expense of the settlor's children.

In our opinion it would be narrow and unreasonable to hold that article six must be construed to require the payment of tax on capital gain out of distributable income. The revenue laws make a clear distinction between ordinary gain and capital gain. This distinction is recognized in the rate of tax, whether the capital gain is on property held more or less than six months, and is also recognized in the right to carry over a net loss from one taxable year to another. Similarly, there is an entire distinction between a direct tax on property itself and a tax liability that is incurred upon a gain in the sale of property, and both such taxes are measured by different standards of rate and time. (See, Black on Federal Taxes, 4th ed., sec. 2; *New York ex rel. Cohn* v. *Graves*, 300 U.S. 308, 81 L. ed. 666.) Because of these distinctions in the revenue laws and because of the overriding purpose to presently benefit his children, we think it not unreasonable to say that the meaning of the language used by the settlor here was that ordinary property taxes and ordinary income taxes arising from the property itself were to be paid "out of the income of the principal" and that such language does not express an intent or purpose to embrace a capital gains tax which is based, not on property, but on a sale of property. Stated differently, the capital gains tax is not a tax upon any part of the principal nor is it required to be paid because of the principal, but only because of a sale of the principal. Under the facts and conditions peculiar to this case, it is only by limiting the settlor's language to such extent,

that his very real intention of presently benefiting his children may be accomplished.

In the absence of clear and unequivocal language which points to an intention that a capital gains tax must be paid "out of the income of the principal," the equitable and realistic meaning of the settlor's language, consonant with his purpose, is that the income beneficiaries shall pay the ordinary or everyday taxes that would be assessed against the property itself, and the income tax on distributable income, but not a capital gains tax that arose by reason of a sale of the property. Such a construction is buttressed by the fact that the contrary conclusion would operate to the detriment of those the settlor sought to presently benefit, and by the further fact that future capital gains for the trust principal would be placed in jeopardy, for the income beneficiaries would be reluctant to give their consent to sales which would have the effect of cutting off their income for appreciable periods.

Thus construed, it follows, from the authorities previously cited, that the tax levied on account of gain realized from the sale of capital will be charged against and payable out of capital. The decree of the superior court of Cook County and the judgment of the Appellate Court are therefore reversed, and the cause is remanded to the superior court, with directions to proceed in a manner consistent with this opinion.

This disposition of the cause renders it unnecessary that we consider the issue of whether article six as construed below provided for an unlawful accumulation of income.

*Reversed and remanded, with directions.*