FIRST NATIONAL BANK OF JOLIET, Trustee, Plaintiff, *v.* HELEN BAKER, Ex'rx of the Estate of RALPH I. BAKER, Defendant-Appellant.—
(MARY ALLOTT BAKER, Defendant-Appellee; YOUNG MEN'S CHRISTIAN ATHLETIC ASSOCIATION, Defendant.)

Third District No. 75-199

Opinion filed January 30, 1976.

Harold Shabelman, of Joliet, for appellant.

Donald Wennlund, of New Lenox, Robson, Masters, Ryan, Brumund & Belom, and Galowich, Galowich, McSteen & Phelan, both of Joliet; for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Defendant Helen Baker appeals from an order of the Circuit Court of Will County directing plaintiff First National Bank of Joliet, as trustee, to sell the home of her deceased father, Ralph Baker, and to use the proceeds to pay for nursing home care for Ralph's widow, Mary Baker.

Shortly before Ralph married his second wife, Mary, in 1968, he placed a substantial number of corporate stocks and his residence property in a trust, with a provision that, after his death, his daughter Helen would receive the income during her life and the principal would pass to her descendants at her death; however, if she had no descendants, then it would pass to the Y.M.C.A. After Ralph's marriage to Mary, he executed a first amendment to the trust agreement by adding the following:

> "Since subsequent to the execution of the original trust agreement, the undersigned married Mary Allott Baker, the right to live in the residence located at 1014 Buell Avenue, Joliet, Illinois, for the duration of her lifetime or at her pleasure is hereby granted to the said Mary Allott Baker without payment of rent. In addition, the trustee shall pay all real estate taxes and may make such expenditures as it deems necessary to maintain the home in a proper state of repair. It may also make such improvements as it may deem necessary for the comfort and welfare of my said wife while living in said home. Upon the death of my said wife, Mary Allott Baker, or upon her remarriage, or if she permanently vacates the premises to establish a new residence, the trustee is

hereby directed to sell my residence to such parties and upon such terms as it may deem advisable and to invest and reinvest the proceeds therefrom according to the terms of the original trust agreement executed by myself on April 5, 1968.

In other respects I hereby reaffirm the said original trust agreement."

A second amendment to the trust agreement was executed in 1971 which provided:

"[Ralph Baker,] pursuant to the power reserved in said Trust Agreement, amends ARTICLE SECOND and ARTICLE THIRD entirely by substituting the following:

ARTICLE SECOND: Upon my death, the Trustee shall continue to hold the remaining principal and any accrued or undistributed income in trust for the benefit of my daughter, HELEN ESTHER BAKER, and shall pay the net income in convenient installments to my said daughter, in addition to such portions of principal as may be necessary for the support and health of my said daughter as the Trustee in its sole discretion shall determine. Upon my daughter reaching the age of Forty (40) years, the Trustee shall distribute to her One-third (⅓rd) of the principal of this Trust as constituted at the time of distribution. When she shall have reached the age of Forty-five (45) years, the Trustee shall further distribute to her One-half (½) of the remaining principal of the Trust as constituted at the time of distribution. When she shall have reached the age of Fifty (50) years, the Trustee shall distribute to her the balance of the Trust. I am mindful of the provision I have made for my present wife to live in the residence which is a part of this Trust; and I direct my Trustee to consider this residence as separate from my other Trust assets in computing the distributions as set forth above. Should my present wife die or cease to live in the residence for any reason, the Trustee at that time shall consider the residence part of the principal of the Trust and the distributions shall then include the value of the residence or the proceeds from a sale thereof.

ARTICLE THIRD: Should my daughter die before reaching the age as set forth in ARTICLE SECOND above, or upon my death if she predeceases me, the Trust as then constituted shall pass to the living descendants of my daughter, if any, and the Trust shall terminate. If there be no such living descendants, the Trustee shall distribute the remaining principal and income to the YOUNG MEN'S CHRISTIAN ASSOCIATION OF JOLIET,

ILLINOIS, subject to the provision for my present wife as set out in the First Amendment to the Trust.

In other respects I hereby reaffirm the said original Trust Agreement and First Amendment thereto."

In 1973 Mary was hospitalized for tests, with a resulting diagnosis of senile psychosis associated with chronic brain syndrome, and cerebral cortical atrophy. According to her doctor, her condition is irreversible, and she requires chronic institutional care. After two months' hospitalization, Mary was transferred to a nursing home where she remains. The cost of her care is approximately $700 per month, and her only income is $120.90 monthly from Social Security. Ralph died in 1974, and since his death, the residence has been unoccupied.

This cause was initiated when the trustee bank petitioned the court for directions concerning the residence property in order to avoid any claim that the bank was wasting trust assets by leaving the home vacant. Mary was represented by a guardian ad litem. Both Mary's guardian and Helen agreed that the residence should be sold. Helen contended that Mary, who was then 74 years old, had vacated the residence, and under the terms of the trust, the proceeds of sale should be made available for distribution to Helen as a part of the trust corpus. Helen was 39 years old. Mary's guardian argued that she had not left the residence voluntarily with the intent of making a permanent home elsewhere, and thus that she had not forfeited her right to care and maintenance as provided by her husband. He asked that her life estate portion of the proceeds be used for her care and maintenance.

By agreement no testimony was presented at trial, and the court considered arguments of counsel, exhibits and pleadings. No objection was made by any party to any representations of fact or introduction of exhibits by counsel. At the conclusion of the hearing, the trial court ordered the trustee to sell the residence and to use the proceeds for the care and maintenance of Mary, with any proceeds remaining at Mary's death to become part of the trust assets available for distribution to Helen. The trial court denied Helen's post-trial motion with a well-reasoned written opinion explaining the decision.

On appeal Helen first asserts that Mary's removal to a nursing home was a permanent vacation of the residence accompanied by the establishment of a new residence which, under the provisions of the first amendment, must result in the termination of Mary's interest in the property. In the alternative, Helen argues that the second amendment changed the condition for termination of Mary's rights because it provided that the residence would become a part of the general trust assets if she should cease to live in the residence "for any reason."

We adopt as our opinion the following portion of the opinion delivered by Judge Thomas Vinson:

"[The First] Amendment, among other things, gave [Ralph's] wife the right to live at 1014 Buell Ave., Joliet, Illinois, 'for the duration of her lifetime or at her pleasure', 'without payment of rent.' Repairs were to be made by the Trustee to maintain such residence, and the Trustee was also ordered to make 'such improvements as it may deem necessary for the comfort and welfare of my said wife while living in said home.' The occupancy of said wife would be terminated upon her death, her remarriage, 'or if she permanently vacates the premises to establish a new residence.'

The Second Amendment * * * concerned mainly charges not related to the realty of the wife of the settlor. But the said Second Amendment does state the settlor is 'mindful' of the provisions made for his said wife, and that the realty was to be held 'separate' from other trust assets, and the Second Amendment then provided that 'Should my present wife die or cease to live in the residence *for any reason*' [underscoring that of the court] the realty should become part of the principal of the Trust.

* * * Helen Baker contends * * * that the removal of Mary Allott Baker from the residence to a hospital and then to a nursing home causes a loss by Mary Allott Baker of any interest in said realty, or any right to occupy the same. This Court has considered the entire Trust Agreement, including the two Amendments. It is significant that the First Amendment provides for loss of the right to occupy, if the wife 'permanently vacates the premises to establish a new residence', and that the Second Amendment sets forth that the settlor is 'mindful' of the provisions heretofore made, and that no mention is made in the Second Amendment of intent to make changes as set forth in the First Amendment. It is the opinion of this Court that the words, in the Second Amendment 'for any reason' do not show an intent to materially alter the provisions made in the First Amendment. Had the Second Amendment been the only instrument before this Court, and were the facts as they are before this Court, in that event this Court would have to find that a vacation of the premises, voluntarily or involuntarily, would have caused a loss of the interest in said realty, as it would be 'for any reason'. But with the First Amendment referred to and affirmed in the Second Amendment, it is the finding of this Court that the words 'for any reason' do not cause such loss of interest by Mary Allott Baker. Further, it is the finding of this Court that Mary Allott Baker has not established a permanent residence elsewhere, and that her involuntary removal for medical reasons to the hospital and then to a nursing home,

do not cause Mary Allott Baker to lose such rights as are created by the Trust Agreement.

\* \* \* And further if this Court has before it two interpretations—one which would cause a widow, in poor mental and physical health, and probably facing a lengthy but terminal illness, to be left destitute, and the other which would result in some comfort to such widow and at least in part result in proper medical and nursing care without public charge, this Court chooses to make some attempt to do justice within the terms of the Trust Agreement."

■■ The trial court's interpretation of the phrase "for any reason" is consistent with the general rule that the maker's intent must be gathered from the whole instrument, giving effect to all the language used, and provisions which appear to be conflicting or inconsistent must be reconciled and harmonized. (*Peters v. Gebhardt* (1955), 6 Ill.2d 534, 129 N.E.2d 731; *Weilmuenster v. Swanner* (1949), 404 Ill. 21, 87 N.E.2d 756.) Applying this rule to the case at bar, the words "for any reason" must be taken to mean "for any of the reasons stated in the first amendment."

Helen also claims that the trial court improperly considered parol evidence consisting of statements of counsel that Ralph paid all Mary's medical, hospital and nursing home charges up to the time of his death. The trial court held that the trust instrument was ambiguous, since it contained no provisions for Mary's involuntary removal from the residence, and that parol evidence was admissible and necessary. Helen concedes that the admissibility of the evidence is not before this court on appeal because she did not object at trial. However, she argues that parol evidence can only be considered to explain circumstances existing at the time the instrument was executed, not those arising later, and that the trial court gave too much weight to this evidence. The court found that the parol evidence "clearly showed a proper relationship of husband and wife" lasting until Ralph died, that there was no intent in the trust agreement "other than of proper interest of a husband in the welfare of his wife," and that Ralph "intended to protect the interest of his wife after his death."

■■ In this case an ambiguity arose because of events occurring subsequent to the execution of the trust amendments. The words used in the amendments were not ambiguous in themselves, but Mary's involuntary removal for medical care was an occurrence not encompassed within the terms of the instrument. In such a situation, the rule that a court will consider only those extrinsic circumstances in existence at the time the trust is executed has been held to be a flexible rule. (*Weir v. Leafgreen* (1962), 26 Ill.2d 406, 186 N.E.2d 293.) Consequently, where sub-

sequent events are indicative of the settlor's intent at the time of execution, such events may be considered. (*Northern Trust Co. v. Winston* (1st Dist. 1975), 32 Ill.App.3d 199, 336 N.E.2d 543.) We therefore conclude that the trial court did not err in considering the parol evidence or in its findings.

The final question is whether Mary was entitled to the use of all of the proceeds, if needed. Helen urges that Mary is entitled to no more than a bare right to possession of the residence, which is less than a life estate, and that to permit the use of the entire proceeds for Mary's benefit was error. Under Helen's theory, the most that Mary would be entitled to would be rental income or interest on the invested proceeds. It is argued on Mary's behalf that the first amendment, which required the trustee to pay taxes and repairs and to "make such improvements as it may deem necessary for the comfort and welfare of my said wife," gave Mary more than a life estate since it might be necessary to use trust assets to maintain and improve the property. The trial court construed these provisions together with the rest of the instrument as showing Ralph's intent to provide for the care and maintenance of Mary after his death.

As was noted in *United States Trust Co. v. Jones* (1953), 414 Ill. 265, 111 N.E.2d 144, the object of judicial construction of a written instrument is to ascertain the true intent of the maker by application of general rules of construction to reach a result which avoids the unreasonable and impractical. The court, quoting Judge Learned Hand in *United States v. Klinger* (2d Cir. 1952), 199 F.2d 645, 648, stated:

> " 'When we ask what * * * [was] "intended," usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.'
>
> In construing a written instrument, its letter should be controlled by its spirit and purpose, bearing in mind that the terms employed are servants and not masters of an intent, and are to be interpreted so as to subserve, and not to subvert, such intent."
> 414 Ill. 265, 271.

Many courts have dealt with the question of what quantum of estate or interest is created by an instrument which purports to establish premises as a home for one or more designated persons. These cases are discussed at length in the annotation at 45 A.L.R. 2d 699 *et seq.* (1956). As the author notes, general rules cannot be applied in these cases because of the variety of interests, together with various qualifica-

tions, limitations, and conditions, that may be created. Where the interest given is limited to personal occupancy of the premises, some courts proceed on the theory that the effect is to confer something less than a life estate while others find a defeasible life estate. (See 28 Am. Jur. 2d *Estates* § 63 (1966).) As is to be expected, we have found no case presenting the exact circumstances of the case at bar. In *Chamberland v. Goldberg* (1959), 89 R.I. 223, 152 A.2d 219, the court found a life estate; however, a mere personal privilege of occupancy was found in *Baldesberger v. Baldesberger* (1954), 378 Pa. 113, 105 A.2d 713, 45 A.L.R. 2d 691, and in *Winters National Bank & Trust Co. v. Shawen* (Ohio Prob. 1964), 205 N.E.2d 135.

A recent Illinois case, *Northern Trust Co. v. Winston* (1st Dist. 1975), 32 Ill.App.3d 199, 336 N.E.2d 543, involved a somewhat similar trust provision giving the widow occupancy of a condominium residence. The reviewing court did not attempt to classify the interest created, but rather determined the widow's obligation to assume mortgage payments on the residence from the settlor's intent as shown by the language of the trust instrument and surrounding circumstances.

The case before us is also one which defies exact classification. The interest given to Mary is neither a typical life estate nor a bare right to occupancy. Mary was to be provided a home, which the trustee would maintain unless she voluntarily relinquished it. When Mary's interest terminates, the home, as maintained and improved, will go to Helen.

■■ After reviewing the trust instruments, we conclude that the order of the trial court, reserving the entire proceeds for Mary's maintenance, fails to carry out Ralph's intention to give Helen the home when Mary's interest terminates. We believe that this intent would be better effected by setting aside for Mary's care and maintenance a share of the proceeds, measured by the value of her life estate interest in the premises. Any of the amount unused at her death would then go into the general trust for distribution to Helen. The remaining share of the proceeds should be paid into the trust for distribution under the terms of the second amendment to the trust.

In summary, while we agree that Mary is entitled to care and maintenance from the proceeds, we must reverse and remand for determination of the value of Mary's life estate interest which is the measure of the share to be used for her benefit.

Affirmed in part; reversed in part, and remanded with directions.

ALLOY, P. J., and STOUDER, J., concur.