S<small>YLVIO</small> C<small>HAMBERLAND</small> *vs.* S<small>AMUEL</small> G<small>OLDBERG</small> *et ux.*

JUNE 11, 1959.

P<small>RESENT</small>: Condon, C. J., Roberts, Paolino and Powers, JJ.

Powers, J.  This is a bill in equity seeking specific performance of an alleged oral agreement creating a life tenancy with a collateral condition in a tenement occupied by the complainant and owned by the respondents Samuel and Marion H. Goldberg, husband and wife, and for injunctive relief.  After a hearing in the superior court on bill, answer, and proof a decree was entered in favor of the complainant. The cause is before us on the respondents' claim of appeal from such decree.

The respondents rely upon the usual reasons of appeal that the decree is against the law, against the evidence, against the law and the evidence and the weight thereof, although they do so by detailed particulars which for conciseness we are omitting.

The bill of complaint alleges and complainant's testimony tends to prove that he and respondents were friendly for approximately twenty years when in June 1948 respondents, who were then living at 1196 Smithfield avenue in the town of Lincoln, decided to build a new home on Grand View avenue in that town.

The complainant, who is an electrician, testified that at that time he was requested by respondents to do all of the

electrical work in connection with the new home and to purchase all of the materials required for the work. He also testified that he was to purchase electrical fixtures and appliances including an electric stove, refrigerator, dishwasher and attic fan, and that he was to be compensated for the materials, fixtures and appliances, as well as for his services. It appears that during his years of friendship with respondents he had previously performed similar work for them from time to time, but that in such instances he was simply reimbursed for whatever purchases he made and that he made no charge for his services. However, he testified that the work on the Grand View avenue home was on a business basis and was not an act of friendship.

The complainant further testified that after all of the electrical work had been completed except for installing the fan in the attic, respondents moved into their new home and shortly thereafter the first of several discussions occurred between him and respondents. He testified that at the first discussion Marion Goldberg suggested that he, complainant, move into the first-floor tenement of the Smithfield avenue house, which had become vacant, but that her husband indicated that he intended to enlarge his drugstore located adjacent to the house and if he did so it would be necessary to move the house from its then location.

The complainant further testified that two weeks later, in the presence of Marion Goldberg, her husband stated that he did not intend to do anything about enlarging the drugstore at that time and suggested that complainant might move into the tenement. It is complainant's testimony that he then asked as to the amount of rent that would be expected, and when no answer was given the discussion as it related to his possible occupancy came to an end.

The complainant's version of a discussion one week later is that Samuel Goldberg, in the presence of his wife at their

home, told complainant that if the latter would fix up the interior of the first-floor tenement on Smithfield avenue he, Samuel, would make necessary repairs to the exterior and that complainant could move in rent free for life on condition that complainant would forget the bill for his services, materials, fixtures and appliances in connection with the Grand View avenue home and their property located on Smithfield avenue. The complainant testified that he considered this a "deal" and moved into the Smithfield avenue house in July 1950. He attributed the time lapse of one year to the necessary renovations of that house.

According to complainant, Samuel asked him for an estimate of the work, materials and appliances on the Grand View avenue home and he replied that it would be about $4,000, exclusive of the appliances which would cost an additional $1,000. This was given to, and at the request of, Samuel who thought the figure was rather high. Later complainant prepared an accurate statement showing that the cost of the work, materials and appliances was $5,331.50. This estimate was furnished to Samuel's brother-in-law in 1954, but no offer to pay it was ever made and complainant had no knowledge as to why it was requested. This request was made almost three years after the friendship between the parties had ceased. The complainant and respondents testified that the friendly relations terminated on Christmas eve 1951, but that the reason was not related to the instant cause.

It is undisputed that on February 17, 1951 Samuel Goldberg gave complainant the following instrument:

"To whom it may concern:

It is my express wish that the tenement now occupied by Sylvio J. Chamberland at 1196 Smithfield Avenue

in the Town of Saylesville, Lincoln should be rent free to him as long as he occupies these quarters, for his own personal use.

Signed—

Samuel Goldberg

Witnessed by
T. J. Bishop Sr.
2-17-51"

This document was signed by Samuel alone and witnessed by T. J. Bishop, his employee, and was delivered to complainant in Samuel's drugstore. The explanations for this paper were in sharp conflict. The complainant testified that Samuel told him that this was the paper he had promised complainant for his protection. He quoted Samuel as saying: "This is the paper that you be protected that no one could put you out of that house. Not even my wife or myself of [or] anybody in my family. You're there for life." The complainant further quoted Samuel as saying: "If you happen to get married, then I will make another paper." The complainant construed this to mean that in the event complainant should marry, his wife too would be protected.

Samuel Goldberg's version is that he was about to take a trip to Florida, and since he was still indebted to complainant for the materials on the Grand View avenue home he wanted to protect complainant until his return when the account could be settled. Samuel insisted that the written instrument was temporary in nature and was to be returned to him when he came back. He admitted, however, that it was never returned adding: "I never thought of it again." The complainant testified that the repairs to the Smithfield avenue house were extensive; that it was over a hundred years old; and that because the foundation had sagged it was necessary to jack up the house and install additional supports. It is uncontradicted that the house

was rewired, the foundation reenforced, and plaster torn out; that new partitions were put in; that it was replastered and painted; and that new doors and hardware replaced the old.

The complainant testified that he was assisted in this work and that in lieu of money payments for the assistance he worked on other property for those who helped him. This was similar to an arrangement that he had in connection with the Grand View avenue house and he explained this by testifying: "Because I made the deal with him so there wouldn't be any bill." Samuel Goldberg admitted that he did not pay for the labor in jacking up the house, the cement work around the foundation, the knocking out of the old plaster, the work in installing new partitions, the rewiring of the house, some work in connection with laying new floors, or for the doors and hardware. It is undisputed that Samuel paid for the heating and plumbing in the renovation of the Smithfield avenue house, but it is also apparent that complainant spent substantial sums and time in connection with the repairs and never submitted a bill, nor did respondents ever request any rent or suggest that any should be paid.

Samuel testified that from July 1950 when complainant moved into the first floor of the Smithfield avenue house until June 1957 he at no time asked complainant to vacate the premises, but he testified that sometime in 1954 he directed Harold Hoyle, an employee, to request complainant's consent to moving the house across the street and that complainant refused. Samuel further testified that he intended at that time to enlarge the drugstore and to provide a parking place for customers, but on complainant's refusal did nothing further about it at that time.

Samuel denied any agreement that would grant complainant a life estate as the latter contended, but his testimony was somewhat evasive as to his understanding of what constitutes an agreement. He repeatedly asked for

clarification of the word and it is obvious from the record that the trial justice was aware of his equivocations. Questioned about the arrangements for complainant to do the electrical work in connection with the new home he responded: "Well, it was understood—mutually understood that he would do the wiring." Asked if there was any understanding as to how complainant was to charge for his materials and labor he answered: "Oh, I think it was definitely assumed that I would be billed for materials only." He testified in this connection that he was to pay complainant's helper and that he did pay Norman Dazier a total of $187.85 by four separate checks which were admitted in evidence as exhibits. He said these payments were made "for roughing in the house."

Samuel testified that he asked complainant many times for a bill in connection with the work on the Grand View avenue home and that his wife was present on some of these occasions. He asserted that at one time complainant gave him an estimate of $3,000, but when respondent questioned the size of the amount the complainant replied that he had not yet computed all of his figures. He further testified that because complainant was experiencing trouble where he was living in Central Falls, he, Samuel, suggested that complainant might move into the Smithfield avenue house which he would have fixed up. He did not remember that anyone was with him when they had this discussion. In response to the question whether or not complainant was to occupy the premises rent free in return for his services, he replied: "There never was an agreement of any kind." He conceded that the materials and appliances were purchased by complainant.

In cross-examination Samuel Goldberg testified that there were many conversations with complainant about the work the latter was to do in the building of the new home, that he could not remember the first one, and he then stated that he did not specifically request complainant to do the

electrical work. He stated that it was just understood. He was asked by counsel: "Well, by that do you mean that he just went on on the assumption that he was going to do it without being asked by you?" to which he replied: "That could very definitely have been, yes, sir." And to a further question: "It could be, but was it?" he replied: "Yes."

Samuel then testified: "There was an agreement on it." Asked if he remembered a specific occasion when the agreement was made he replied: "Well, there was never any formal agreement." Still under cross-examination he admitted that he had paid complainant nothing for the labor and materials in repairing the Smithfield avenue house, that complainant had lived there for almost seven years without being asked to move and without paying rent or ever being asked to pay any, but he denied that there was ever any agreement about complainant's occupancy.

At this point the trial justice inquired regarding the witness' understanding of the word "agreement" and Samuel responded: "Well, the term appears rather vague to me. I would think it was an agreement to a certain price or given time or something like that. We never discussed either rent—I don't believe we ever discussed the subject at all." Pressed by the trial justice for a more definite explanation of respondent's understanding Samuel testified: "There was no agreement of any kind." At the conclusion of his cross-examination he admitted that the consideration for complainant's occupancy was the discharge of his obligation to complainant for work and labor on "that house?" presumably meaning the Smithfield avenue property.

Marion Goldberg testified that she was the joint owner with her husband of the Grand View avenue and Smithfield avenue properties; that following her marriage in 1938 she became friendly with complainant, stating: "Well, he was a close friend to both of us * * *"; that she was not present at any discussion concerning the building of the new home,

but knew that complainant was to do the electrical work; and that she was present on at least two occasions when her husband requested a bill from complainant for the work on the new home.

She further testified that she did not suggest to complainant that he move into the Smithfield avenue house; that she was not present at any discussion with her husband about complainant's occupancy; that she knew he moved in, but had no knowledge of any agreement relative thereto; that she instructed complainant as to the refrigerator he should buy; that she did not know of the document given by her husband to complainant until the day before the trial; and that she never authorized her husband to execute such a document.

Questioned specifically about her share in the control of the Smithfield avenue property she testified that it was her husband's business; that he alone rented the property, collected the rents and arranged for repairs; that she had no objection to this arrangement; that she had nothing to do with evicting complainant and did not know of the proceedings until the day she was subpoenaed; and that at the time of her testimony she did not know she was a party to the proceedings. This last statement she repeated when further questioned by the court.

It is notable that neither complainant nor respondents called as corroborative witnesses any of the persons mentioned by them as having been present at some of the conversations.

The bill of complaint recites, and by their answer respondents admit, that on June 10, 1957 complainant was served with a notice of eviction as a tenant at will; that a writ of trespass and ejectment dated June 28, 1957 returnable to the eleventh district court was served on complainant; and that at a trial in that court, judgment was entered for respondents, from which judgment complainant ap-

pealed to the superior court where the appeal is still pending.

The trial justice found "that the complainant entered into the agreement with the two respondents to render this labor, and to furnish these materials in the house on Grand View Avenue, and later that he agreed to furnish labor and materials on the Smithfield Avenue house, and that he entered into the house on Smithfield avenue as considerations for the cancellation of his bill against both respondents for the doing of the work upon each of these houses."

The trial justice further found that the written instrument was not a contract in and of itself but merely an expression of desire which, however, tended greatly to corroborate the complainant's testimony that there was an oral agreement for a life estate with a collateral condition, and that Marion Goldberg was aware of the agreement and consented to it. We cannot say that he was clearly wrong.

On the question of such an agreement between complainant and respondent Samuel Goldberg, the trial justice said: "I think the document quoted in paragraph 6 of the bill taken in connection with the testimony of the complainant requires me without hesitation to say that there was such an agreement." A review of the record, coupled with a reasonable interpretation of the written document and Samuel's explanation of that document, convinces us that the trial justice was justified in his conclusion.

The conclusion reached by him on the question of whether or not Marion Goldberg was aware of the agreement and consented to it was equally justified in the light of her testimony. Her testimony as to the circumstances of which she had knowledge and those of which she had none, considering the relationship of husband and wife, so nearly approaches that which is inherently improbable as to tax the credulity of the court. We are constrained to reach this conclusion from a reading of the cold transcript

without the benefit of hearing or observing the witness, an advantage which the trial justice had.

The creation of a tenancy for life subject to a future contingency is not unknown in this jurisdiction. In *Disley* v. *Disley*, 30 R. I. 366, this court found that an agreement between the owner and his daughter whereby the latter could occupy the premises "until further agreement between said parties" constituted the daughter a tenant for life. The court cited with approval 4 Kent's Com. (12th ed.) *p. 26, Lect. LV, wherein that author declared: "These estates may be made to depend upon a contingency, which can happen, and determine the estate before the death of the grantee."

The respondents make four major arguments and contend that should any one of them be resolved in respondents' favor the decree of the superior court should be set aside. We do not disagree with this latter contention, but we are not persuaded that any of these arguments has merit.

The respondents' first argument is that the trial justice erred in finding that an oral agreement had been consummated by failing to apply the rule that such oral contracts are entitled to specific performance only where the evidence is clear and convincing and that the alleged oral contract in the instant case was not established by clear and convincing evidence. They cite *Peckham* v. *Barker*, 8 R. I. 17, *Mann* v. *McDermott*, 77 R. I. 142, *Johnson* v. *Johnson*, 51 R. I. 296, and numerous other cases in support of this contention. We are not unmindful of the doctrine for which they stand and the circumstances in each of the cases under which the rule was applied, but we are of the opinion that the evidence in the instant case was clear and convincing. It is not necessary that the trial justice should have actually used these words in reaching his decision. It is enough that this court in reviewing the record and applying the rule can find that he could, as he stated he did, make his finding without hesitation.

The second argument advanced by respondents is that there was insufficient part performance to take the case out of the statute of frauds, and that such part performance by complainant was not exclusively referable to the alleged oral contract. In support of this contention they cite *Oakland Cemetery Co. v. Smith*, 54 R. I. 136, *Maher v. James Hanley Brewing Co.*, 23 R. I. 323, *Lambert v. Lambert*, 82 R. I. 166, and several other cases decided in this and other jurisdictions. The authorities quoted and relied on by respondents are readily distinguishable on their facts from the circumstances prevailing in the case at bar. It is undisputed that complainant gave up his home in Central Falls; that he performed substantial services and paid for materials, fixtures and appliances for which he has neither been paid nor ever sought compensation; and that he resided in the Smithfield avenue house for seven years without ever being requested to vacate the premises or to pay rent for his occupancy. All of his conduct in this regard is referable to the oral contract that the trial justice found existed.

The respondents' third argument, that the decision by the trial justice that respondent Marion Goldberg made or authorized her husband to make an agreement in her behalf with complainant was erroneous, is without merit. The trial justice found that the document dated February 17, 1951 was not such evidence in writing as would satisfy the statute of frauds, but was corroborative evidence of the agreement between complainant and Samuel Goldberg. The cases cited by respondents on this issue are not applicable. In connection with respondents' third argument the trial justice found that Marion Goldberg was aware of and consented to the agreement and, as we have stated, in the light of her testimony we cannot say that he was clearly wrong.

The fourth argument, that equity and justice do not require a decree of specific performance, is directed to the

sound discretion of the trial justice and we are not convinced that he abused his discretion. They argue that an accounting between the parties might be ordered. The complainant's bill prayed for such an accounting to which respondents answered that if complainant ever had a cause of action it was now barred by the statute of limitations in an action at law and should not be extended by a court of equity. Furthermore, respondent Samuel Goldberg testified that he did not now believe himself indebted to complainant for the reason that the accrual of rent was more than sufficient to discharge any debt that might have been owed to complainant. Whether this would be so or not is not apparent, but it is clear that the debt which complainant discharged would be so greatly reduced as to deprive him of the full enjoyment of the agreement which the trial justice found to have been made and with which finding we are in full accord.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Crowe, Hetherington & Chester, Benjamin C. Chester,* for complainant.

*Edwards & Angell, Edward F. Hindle, Ernest N. Agresti,* for respondents.