WINTERS NATIONAL BANK & TRUST COMPANY, PLAINTIFF, *v.*
SHAWEN, EXR., ET, DEFENDANTS.

Probate Court, Montgomery County.

No. 161449. Decided May 1, 1964.

Messrs. *Cowden, Pfarrer, Crew & Becker*, for plaintiff.
Messrs. *Murr & Seeley*, for defendants.

ZIMMERS, J.  This cause is before the Court on the petition of the Winters National Bank and Trust Company of Dayton, executor of the estate of Charles E. Shawen, deceased, for a determination of the respective rights of the said Bank as Trustee of a testamentary trust under the last will and testament of said Charles E. Shawen, and his brother and sister, Robert B. Shawen and Martha Jane Allaman, with respect to certain real estate passing to them under the will of Agnes B. Shawen, their mother.  Answers were filed by the said Robert B. Shawen, individually and as executor of the last will and testament of Agnes B. Shawen; by Martha Jane Allaman and by the said Bank as Trustee of the trust under the will of Charles E. Shawen, deceased.

The dispositive provisions of the will of Agnes B. Shawen, deceased, are as follows:

"*ITEM II.*  I give and bequeath to my son, Robert, my diamond ring which is located in my safe deposit box in a box marked 'Agnes.' "

"*ITEM III.*  I give and bequeath all of the remainder of my jewelry to my daughter, Martha.

"*ITEM IV.*  To my sons, Charles E. Shawen and Robert B. Shawen, and the survivor of them, I give, devise and bequeath my home and residence, including furnishings and equipment, and the tract of ground connected therewith and known as 401 Odlin Avenue, Dayton, Ohio, so long as either of them uses said premises for and as his residence.  At the time that both of them cease to use said premises as and for a residence, I give, devise and bequeath the same to my three children, Martha Jane Allaman, Charles E. Shawen and Robert B. Shawen, or the survivor or survivors of them in equal shares. My sons, Charles E. Shawen and Robert B. Shawen, shall have the right to dispose of any part or all of the said premises constituting my home and residence at any time after my death.

In the event such a sale or sales are consummated, the net proceeds of such sale or sales shall be divided equally among my three children, Martha, Charles and Robert, or the survivor or survivors of them, and the purchaser or purchasers shall be under no obligation to see to the application of the proceeds of the sale or sales.

"*ITEM V.* All of the remainder of my real and personal property, I give, devise and bequeath, equally, to my three children, Martha Jane Allaman, Charles E. Shawen and Robert B. Shawen."

The following stipulation of facts was agreed to by the parties:

"The Winters National Bank and Trust Company of Dayton, Executor of the Last Will and Testament of Charles E. Shawen, deceased, Plaintiff, and Robert B. Shawen, individually and as Executor of the Last Will and Testament of Agnes B. Shawen, deceased, and Martha Jane Allaman, Defendants, by their counsel, hereby submit the following agreed statement of facts to the Court for its consideration and decision:

"1. On August 16, 1956, Agnes B. Shawen died testate in a fire which destroyed her home at 401 Odlin Avenue, Dayton, Ohio. The home, a fine stately brick and stone constructed building was located on a tract of 16.4 acres of land, which real estate is described in the Petition. Also located on the real estate is a barn, two sheds and several outbuildings, including a two-car garage; these buildings were not damaged or destroyed by the fire. Agnes B. Shawen and her husband, Dr. Charles E. Shawen, who died in the year 1951, resided on the property and used the same as their home from December, 1917. The property had been in the Shawen family since about the year 1910.

"2. Agnes B. Shawen executed her Last Will and Testament August 24, 1953, two years after the death of her husband. At the time of her death, Agnes B. Shawen was 77 years of age. Her Last Will and Testament was prepared by Emerson L. Horner, an attorney who was practicing law in the City of Dayton, Ohio, in the year 1953, and who died in August of the year 1961; before his death Mr. Horner acted as attorney for the estate of Agnes B. Shawen.

"3. Three children were born of the marriage of Dr. Charles E. Shawen and Agnes B. Shawen, the oldest of whom was Martha Shawen Allaman, who was born September 22, 1905. Charles Edwin Shawen, son, was born August 13, 1908, and Robert B. Shawen, son, was born May 5, 1913.

"4. Daughter, Martha, was 47 years of age at the time the Last Will and Testament of Agnes B. Shawen was executed. Until the time of her marriage to David W. Allaman in 1931, she lived with her parents. Martha has no children. Her husband has been employed as Office Manager of the Precision Rubber Products Corp., Dayton, Ohio since 1951. Martha Allaman has never been gainfully employed. The Allamans reside at 125 Otterbein Avenue, Dayton, Ohio.

"5. Charles Edwin Shawen was 45 years of age at the time Agnes B. Shawen made her will. Until the time of the fire, Charles had always lived at home with his mother and his brother, Robert, neither son having married prior to their mother's death. At the time of his death, Charles was employed as auditor for The Winters National Bank and Trust Company of Dayton, Ohio; he had been an employee of the bank since 1934. In about the year 1938, when Charles was 30 years of age, he began to develop a tumor in his forehead. For this he first had surgery in the year 1948, at which time a part of the bone in the forehead was removed and replaced with a plate. In about the year 1958, an infection developed under the plate which festered out through an opening in the top of his head. In January 1961, he again had surgery at which time the plate was removed; this was followed by additional surgery in July 1961. In March of 1962, Charles again was required to have surgery to remove another tumor which was developing at the base of his skull; he died April 1, 1962, as an indirect result of the same from pneumonia. Charles E. Shawen was first married September 30, 1961 at the age of 53 years. He had no children.

"6. Son, Robert B. Shawen, was 40 years of age at the time of the execution of the Will of Agnes B. Shawen. He never married until after the death of his mother and lived at home with his mother and brother, Charles, until the time when the house was destroyed by fire. At the age of 17 Robert first

developed symptoms of what was later to be diagnosed as Marie-Strumpeal Snydrome (Ankylosing Spondylitis). By 1945-1946 the illness had very nearly run its course and Robert's physical condition became more or less stabilized, resulting damage being a 'Poker' or literally a one piece spine. During the active course of the illness, Robert was unable to work regularly. About 1940 he worked part time as Research Librarian for the Kettering Institute for Medical Research at Miami Valley Hospital, where he was also a patient, and later he worked briefly as a bookkeeper in the dietary department for the same hospital. About 1946 he commenced work in the office of a local C. P. A. on a part time basis and it was not until about 1948 that he entered work on a fulltime basis. In 1960, Robert was issued a permit by the State Accounting Board to practice as a Public Accountant in Ohio and since January 1960 he has maintained his own practice at 801 Harries Building, Dayton, Ohio. Robert was first married May 20, 1961, and presently resides with his wife at 811 Ferndale Avenue, Dayton, Ohio. He has no children.

"7. Immediately after the fire which destroyed the Shawen Home the two brothers, Charles and Robert, moved in with their sister Martha, and both continued to live with their sister until their marriages. Since the time of the fire, Robert has gone back to the home place on an average of at least four or five times per week to check and maintain the property and to prevent vandalism. He has kept the weeds cut, has made repairs on the barn and other outbuildings, and has kept the lawns mowed. Until March 1962, when Charles went into the hospital for the last time, the water was kept turned on and the electricity has never been turned off. During the summer months, Robert has cultivated and gardened part of the land and has attempted to keep the flower beds in good condition. Charles, likewise, participated in the maintenance of the property although to a lesser degree than Robert because of his worsening physical handicap.

"8. During his lifetime, Charles did not purchase his own home but instead lived in a rental property and Robert is presently living in a rental property and has never purchased a home of his own.

"9. After the fire, a settlement was made with the insurer of the property and a total of $7,260.00 was paid to the estate for the loss of household goods and furnishings located on the property which belonged to Agnes B. Shawen, and $27,500.00 was paid to her estate to cover the loss of the home. The Executors have maintained an insurance policy on the property since the date of the fire to cover the barn and other outbuildings.

"10. Charles and Robert, although they studied and discussed the disposition of the real estate, were never able to reach a mutually conclusive decision relative to the future of the same. An appraisal of the real estate was made for the estate of Agnes B. Shawen as of the date of death and said value was set at $75,000.00; later another appraisal was made as of one year after the date of death and at that time the value was set at $60,000.00. On November 14, 1956, a letter was received, at the request of Charles and Robert, from Thomas Henderson, Architect, in answer to questions relative to various time elements and other matters pertaining to the rebuilding of their home. On July 17, 1958, an appraisal was made by James Kern of the City of Dayton, and in December, 1958, a topographical map of the real estate was made by the Ralph Woolpert Company of Dayton, Ohio, in an attempt to determine what disposition and land usage should be made of the real estate. After Charles was married he sought advice concerning the possibility of reusing the bricks in the burned-out home in the construction of a new home. The old brick walls still stand as they did immediately after the fire. No decision was ever reached as to the disposition of the real estate by Charles and Robert.

"11. The estate of Agnes B. Shawen has never been closed and is still pending. No certificate of transfer has ever been filed in the estate showing a disposition of the real estate. Since the time of the fire, several persons and corporations and two churches have made offers to Charles and Robert to purchase the property, or portions thereof, but no decision was ever reached to sell the same and all of the prospective purchasers were told that the property 'was not for sale.'

"12. Robert, at various times, discussed with his brother

and sister the possibilities of rebuilding the old home and going back there to live or the advisability of building a new home on the land to be used by him as his home, and Charles, during his lifetime, also discussed the possibility of doing the same for himself, but no final decisions were ever made by the brothers.

"13. On March 3, 1959 Robert B. Shawen wrote a letter to Mr. Lowell Murr, Attorney, asking his opinion as to the construction of the Will of Agnes B. Shawen in an attempt to reach some kind of a decision with his brother Charles as to the disposition of the property.

"14. Because of the uncertainty as to the interpretation of the Will of Agnes B. Shawen, and the uncertainty as to the health of both, Robert and Charles, no final decision as to the disposition of the real estate described in the Petition either by Charles or Robert, individually, or by them as Executors of the estate was ever agreed upon, or made to this date and Robert as the surviving son is unable to make a decision until the questions as asked by the Plaintiff in the Petition and by the Defendants in the Answer have been answered.

> Respectfully submitted
> /s/ Cowden, Pfarrer, Crew & Becker
> _____
> Attorneys for Plaintiff
>
> /s/ Murr & Seeley
> _____
> Attorneys for Defendants"

The following Amendment to the Stipulation of Facts was later filed:

"The Winters National Bank and Trust Company of Dayton, Executor of the Last Will and Testament of Charles E. Shawen, deceased, Plaintiff, and Robert B. Shawen, individually and as Executor of the Last Will and Testament of Agnes B. Shawen, deceased, and Martha Jane Allaman, Defendants, by their counsel, hereby submit the Amendment and additions to the Stipulation of Facts as filed October 8, 1963:

"Item 9 of the original Stipulation of Facts shall be

amended and corrected to show that after the fire a settlement was made with the Insurer of the property, Globe and Republic Insurance Company, and a total of $7,157.14 was paid to the Estate for the loss of household goods and furnishings located on the property, which belonged to Agnes B. Shawen, and $27,500.000 was paid to her Estate to cover the loss of the home. The Executors had maintained an insurance policy on the property since the date of the fire to cover the barn and other outbuildings.

"In support of the statement pertaining to the distribution of the insurance proceeds, copies of the following documents are hereby submitted as evidence:

"1. Copy of letter from Robert B. Shawen, Public Accountant, dated April 1, 1964, explaining distribution of proceeds received from the insurance company;

"2. Credit Memorandum addressed to the Estate of Agnes B. Shawen from The Oscar C. Olt Co., and dated January 4, 1957;

"3. Letter from The Oscar C. Olt Co., dated January 4, 1957;

"4. Copy of worksheet showing computations used for effecting a distribution.

APPROVED:

/s/ Cowden, Pfarrer, Crew & Becker
_____
Cowden, Pfarrer, Crew & Becker
Attorneys for Plaintiff

/s/ Murr & Seeley
_____
Murr & Seeley,
Attorneys for Defendants."

It is the plaintiff's contention that under the terms of Item IV of the will of said Agnes B. Shawen, Robert B. Shawen, Martha Jane Allaman and Charles E. Shawen are the devisees of the residential real estate and that the defendants, Robert B. Shawen and Martha Jane Allaman and the trust under the

will of Charles E. Shawen, deceased, each are entitled to an undivided one-third interest therein and that Robert B. Shawen does not have the power to sell the premises or any part thereof since the death of Charles E. Shawen.

The defendants, Robert B. Shawen and Martha Jane Allaman contend that by virtue of said Item IV they are the sole devisees of said property; that said Robert B. Shawen still retains the right to occupy the same as his residence and that he has the power to sell the same pursuant to said Item IV, upon which sale the proceeds would be divided equally between the said Robert B. Shawen and Martha Jane Allaman. It is the further contention of the defendants that Robert B. Shawen would now have the right to use the insurance proceeds to rebuild the residence which was burned or erect a new residence in place thereof on the real estate in question and to furnish said home with part of said funds and to occupy said rebuilt house and to use such furnishings for his residence ''so long as'' he so desires.

All the parties agree that the intent of the testatrix as expressed in her last will and testament controls the disposition of the problems confronting the Court. The parties further agree that the cardinal rule of will construction is that the Court and parties must construe the will from the four corners, placing themselves as nearly as possible in the situation of the testatrix at the time of the execution of the will, to-wit: considering all relevant and surrounding facts and circumstances as have been brought to the attention of the Court in the stipulation of facts. A major portion of the briefs of the respective parties is devoted to the nature of the legal property interests created under the will of the testatrix, and the point of time at which these property interests vest in the respective parties.

The Courts of the nation have been inconsistent when confronted with the problem of describing the legal nature of the property interest created when a donor grants the right to a person or persons to occupy real estate and upon the failure to continuously occupy a gift over is made. Since neither the controlling instrument nor the surrounding facts and circumstances are identical in any two such cases, these cases are

merely significant as guides to reasoning and not as controlling precedents.

Among the Ohio authorities the case of *Nelson* v. *Nelson,* 19 Ohio Reports 282 (1850) has been cited in text materials to establish that such an intermediate estate or right is in fact a defeasible life estate. Scrutiny of the opinion, however, discloses that the Court has not used the term "life estate" in the syllabus or the written opinion of the Judge.

In the case of *Loose* v. *Loose,* 30 Ohio Opinions, 333, an Ohio Probate Court decided that such an intermediate estate or right was something less than a "life estate." It was there held that the nature of the right created was a tenancy at will.

The cases throughout the nation concerned with this question are collected in 45 A. L. R. (2d), 699, particularly Sections 3, 4, 5 and 6 of the annotations and the supplements thereto. The cases can be clearly divided into two categories: (1) those which hold that the intermediate estate or right created is a "life estate," but some of which go on to hold that the usual incidents of a life tenancy are not all present, and (2) those which hold that the interest created is a mere incorporeal right or a personal privilege to occupy.

The fully reported chief case preceding said annotations is *Baldesberger* v. *Baldesberger,* 378 Pa., 113, 45 A. L. R. (2d), 691, in which the Supreme Court of Pennsylvania decided that the intermediate interest was an incorporeal right or privilege rather than a life estate and that such right could be abandoned. The Court reasons that when the instrument clearly does not give the right to sell the limited right to possession or to lease or rent out the premises, all of which are basic incidents to a "life estate," there is no reason to describe the property interest created as a "life estate." It is in fact not an estate at all, but a bare personal right to residential use.

It is also interesting to note that in the *Nelson case, supra,* decided by the Supreme Court of Ohio, the unmarried daughters who were given the right to occupy the premises failed to sustain their contention that they were also entitled to maintenance from the rent if they did not occupy.

Since Item IV of the will at bar does not give any of the usual incidents of life tenancy except the right to occupy and

in the Court's opinion in fact precludes Charles or Robert from leasing or renting said premises, the Court concludes that the intermediate interest created is a mere right to residential occupancy and that the freehold estate in the case at bar a fee simple conditioned upon surviving the abandonment, sale or death of Charles and Robert, whichever event occurs first, vested in the three children of the testatrix upon her death. The executory interests in said real estate and furnishings also passed to the three children.

The next question to be decided by the Court is the extent of these personal rights to occupy and more specifically whether such rights were abandoned during the lifetime of Charles Shawen, thereby ripening the executory interests into undivided interests in an absolute fee. The respective parties have devoted great portions of their briefs to the question of whether a reasonable time had elapsed between the destruction of the property by fire and the date of filing of this action, during which Charles and Robert Shawen should have exercised their right to rebuild if they were to preserve their right to occupy the premises. Or, as stated in the defendants' brief, are the brothers guilty of such laches as to preclude their rights now to assert the right to occupy?

While the Court is impressed with the reasoning and arguments of the plaintiff that Robert and Charles certainly had sufficient time in which to make a decision to use the premises as their residence, the Court is of the opinion that this question must be disposed of on another basis. The will clearly terminates the intermediate estate at that time when both of the sons of the testatrix ceased to use said premises as a residence. The will does not expressly set forth criteria for determining such event. It is the construction of this provision together with the surrounding facts and circumstances which disposes of the immediate question.

It is accepted that the Court cannot re-write the will of the testatrix and on the other hand it cannot be expected that every possible situation that the testatrix considered to terminate the intermediate interest could be foreseen or provided for by her. The brothers could have begun residence and then temporarily parted because of a disagreement; one or both of the

brothers could have taken temporary employment in another section of the country; one or both of the brothers could have taken an extended vacation or either of them could have retired from his job and established winter residence in another location of the country. Further questions of degree of the right to occupy could have arisen. For instance, did the right include bringing in as tenants so many people as each son desired so long as the son continued to reside thereon. Of, did it only include the right to bring a wife and children on the premises and if so, does the right of the wife or children to reside expire with the life of their respective husband and father. If not, at what point does the fee holder become entitled to possession.

Obviously, all of the above questions are not presently to be decided by this Court. But, the suppositions are here set forth to illustrate the superficiality of the defendant's contention that he is still entitled to make his home on the real estate in question since the will says that he has the right and that an unreasonable time has not yet elapsed for him to have abandoned that right.

It should also be noted that if Robert did not abandon the right, Charles did not do so. It would then become material for the Court to decide whether the testatrix intended the wives of the respective sons to be permitted to reside with their husbands on the premises and, if so, whether the respective wife's right did expire with the life of her husband. It certainly seems to this Court to be an unreasonable construction to hold that the testatrix intended the family of the respective sons to have the right of occupancy and yet to further hold that this right in the members of the family expired with the life of their husband or father. The important question for construction is whether the testatrix intended the families of the sons to have or not to have the preferential right to occupy. The Court is of the opinion that she did not so intend.

The testamentary plan clearly shows that the testatrix intended to treat all three of her children equally except with respect to the residence. Since it had always been the homestead of the testatrix and her sons and neither of her sons had married, she intended them *and only them* to have the right to

retain the same as their residence. This Court, in light of the surrounding circumstances evidenced by the stipulation of facts, finds that the testatrix intended a subsequent marriage of one or both of her sons to extinguish their respective rights to occupy the residence. There is no indication in the will that after the sons should choose the marital state as did their sister, they should still be preferred over her.

The Court realizes that such construction can be criticized as "re-writing" the will of the testatrix. Such is the case in any decision in which the Court does not literally interpret the language of an instrument. Indeed, if the Court were to hold as the defendant, Robert, contends, the Court would also have to "re-write" the will to include the spouses of the respective sons within the right to occupy the premises as a residence. That is, this Court presumes that the defendant, Robert, contends that he may bring his wife upon the premises when he either rebuilds or reconstructs a home thereon. It must be concluded that the Court "re-writes" a will only when it construes the instrument in a manner contrary to the opinion of another court or lawyer.

After the fact it is easy to say that if the testatrix intended marriage to terminate the right of the son to occupy she could and should have so provided. But realistically, as heretofore pointed out, there were many possible situations upon which this testatrix intended to terminate the right to occupy, all of which are embraced in her requirement that the right to occupy should exist only so long as her sons use it as their residence. Some of these she could and some she probably could not have imagined at the time she executed the will. She did, however, clearly provide that upon the failure to use or the discontinued use of the premises as a residence by both sons the intermediate right expired. The Court construes this language to clearly indicate an intent that the homestead was to continue to be a homestead as long as Charles and Robert, the sole survivors of her homestead, could and would occupy it. But marriage customarily creates a new homestead as the testatrix recognized when she precluded her daughter from the right to occupy so long as the sons occupied it as their home. A testatrix does not have to expressly say that which surrounding cir-

cumstances and her testamentary plan clearly illustrate. This Court concludes, therefore, that the marriages of the respective sons of the testatrix terminated their respective rights to occupy the residence as "his residence" and that upon the last of the two marriages the intermediate right of occupancy was abandoned and the fee simple in the residential real estate became unconditionally vested, one-third in Charles, one-third in Robert and one-third in Martha Jane Allaman. Whether this fee is subject to the power of sale will be decided later in this opinion.

Obviously, the same rights that were created in the residential real estate were created in the furnishings, and there is nothing contained in the stipulations of facts which can lead this Court to any conclusion other than that the proceeds of the fire insurance contract pass to the same parties in the same manner and to the same extent as does the real estate.

The only remaining question is whether the power of sale created by the testatrix in Item IV is joint and, therefore, expires upon the death of either son or whether it remains in the survivor. Counsel for all parties agree that while there are abstract rules concerning the extent of a power when granted to two or more donees, the intent of the donor in the creating instrument is controlling. This Court deems it unnecessary to consider the rules cited by the parties since it is clear that this testatrix intended the power to survive the death of Charles or Robert. She states in Item IV that both of the sons shall have the power of sale "at any time after my death." She then further provides that upon execution of the power the proceeds should be divided among the three of her children "or the *survivor* or survivors of them." (Emphasis added.) The use of the singular must be interpreted to mean that any sale while either of her sons were alive was to be effected by them or either of them and, therefore, she intended the power to survive.

The Court is of the opinion, however, that its holding that the power survives and that the proceeds shall be distributed to the "survivor or survivors" does not alter its opinion that one-third of residence vested in Charles and is now contained in the trust under his will. Distribution of the proceeds to the "survivors" must be construed in light of the clear intent that

the cessation of residential use vested the fee in the children alive at that time. The death of a child before consummation of a sale does not foreclose his successors from their share of the proceeds. The word "survivors" in the distribution of proceeds clause refers back to the time that the fee became unconditionally vested. There are numerous legal authorities which establish that a gift over of the proceeds passes to those vested with legal title unless the donor clearly indicates that they must survive the time of distribution in order to receive the same.

To summarize the holdings of the Court herein, the Court is of the opinion that the right to occupy was an incorporeal right and upon the death of the testatrix the fee simple conditional was vested in her three children. When the last of her sons married the right to occupy was abandoned because she intended such right to exist only so long as the original homestead remained and the marriage of each son created a new homestead for himself. The fee then became unconditionally vested in her three children. The proceeds of the fire insurance policy pass to the parties as their interests now appear. The power of sale survives Charles and Robert now may sell the premises and dispose of the proceeds in accordance with the holdings of the Court herein.

An entry may be prepared accordingly, with costs to the estate.