Robert Adams CHILE

v.

Horace P. BECK, Jr., et al.

No. 80–35–Appeal.

Supreme Court of Rhode Island.

Nov. 16, 1982.

Tillinghast, Collins & Graham, Providence, Louise Durfee, Robert W. Edwards, Christopher H. Little, for plaintiff.

Moore, Virgadamo & Lynch, Ltd., Jeremiah C. Lynch, Jr., Newport, Thomas T. Brady, Inc., Thomas T. Brady, Tiverton, for defendants.

OPINION

KELLEHER, Justice.

This controversy arises from the construction by a Superior Court justice of the May 29, 1969 will of Dorothy Bateman Beck (Dorothy), who at the time of her death in November 1972 owned the Bateman Farm, a parcel of land of almost sixty acres situated in the town of Tiverton on the westerly side of Punkateest Neck Road. The litigants are the plaintiff, Robert Adams Chile (Robert), the farm's faithful caretaker of forty years; and the defendants, Horace P. Beck, Jr. (Horace), Dorothy's son, and Bernard and Geraldine Taradash, who purchased the farm from Horace sometime after Robert and Horace became involved in this litigation.

At issue in the Superior Court, as it is here on appeal, is just what Dorothy intended when her attorney drafted a will that, by

its twelfth clause, gave Bateman Farm to her son Horace "absolutely and in fee simple" but at the same time provided that if the farm was sold, Robert was to have the right to occupy Resurrection Piece, a guest house on the farm, "rent free for his life or for so long as he desires the same for his residence, together with a right of way from the back gate of the farm to said building. The conveyance of the farm shall be subject to this right of occupancy of Robert Adams Child." [1]

The trial justice, in rejecting Robert's claim that he had a life estate in the premises, relied upon the rule of construction found in *Rhode Island Hospital Trust Co. v. City of Woonsocket,* 48 R.I. 345, 347, 137 A. 411, 412 (1927), which states that when a testator has made an "absolute estate in fee in land * * * a subsequent provision inconsistent with the absolute nature of that gift shall be regarded as a repugnant provision and treated as void in law." We acknowledge the repugnancy principle referred to in the *City of Woonsocket* case but are of the opinion that it is irrelevant to the case at bar.

Before proceeding to detail the rationale of our disagreement with the trial justice's conclusion, we shall look briefly at the pertinent evidence presented before the trial justice.

Robert had been employed by Dorothy as the caretaker of Bateman Farm since 1932. His responsibilities included taking care of a dairy herd that at times numbered as many as thirty-four cows and acting in such various capacities as plumber, carpenter, gardener, landscaper, and messenger. In return Robert received a salary that at one time reached as high as $220 a month plus housing (including utilities), food, and clothing. Throughout his employment and for some time after Dorothy's death, Robert lived in a house on the premises known as Farmer's Cottage.

Through the years Robert and Horace had been friends. Proof of this amicable relationship was a book written by Horace and given by its author to Robert with the following inscription: "To Bob, a friend of over forty years standing." This amicable relationship came under a strain once Horace retired from his academic duties at one of New England's prestigious colleges to assume the role of farmer. According to Horace, shortly after the change he realized that "a person who has a cow is a nursemaid, works morning and night, 365 days a year, to take care of them. I thought that was hard work * * * and I suggested something smaller." The "smaller" items were five sheep, but Robert preferred being a bovine babysitter to being a sheepherder.

As time marched on, the forty-year Bateman Farm friendship progressively unraveled. The situation deteriorated to the point that Horace's attorney informed Robert that his services were no longer required and that he was to leave the farm. Robert responded by instituting this suit.

The primary purpose of any willconstruction suit is the discovery of the testator's or the testatrix's dispositive intent by reading the will in its entirety in the light of the circumstances attendant to the will's execution; and if the intent can be ascertained, it will be given effect as long as it is not contrary to law. *Prince v. Roberts,* R.I., 436 A.2d 1078 (1981); *Strauss v. van Beuren,* 119 R.I. 376, 378 A.2d 1057 (1977); *Lux v. Lux,* 109 R.I. 592, 288 A.2d 701 (1972). No one can quarrel with the rule of construction relied on by the trial justice, but this rule, like any other construction, must be subordinated, as here, to the testatrix's intent and must yield to that intent.

In *City of Woonsocket,* 48 R.I. at 346, 137 A. at 412, the testator, in giving his sister the residuary estate, had executed a will that contained the following term of art: "[T]o her, her heirs and assigns forever." Even though there appeared to be some language qualifying the gift, there was adams Child.

---

1. Robert has been known at times as Robert Adams Chile and at other times as Robert Ad-

ditional language that read: "It is my will * * * that my sister * * * is not to be restricted in any manner whatever from using and disposing of any part or all of my estate." Thus, the language under scrutiny in the *City of Woonsocket* case demonstrated a clear intent to make an absolute gift of the residuary estate.

However, this is not the case in regard to Dorothy's will. When her will is read in its entirety, it is obvious that Dorothy intended that Robert would have a roof over his head, to wit, Resurrection Piece, in the event that her son should decide to sell Bateman Farm. There is no indication that she had any intention of abandoning her caretaker when she executed the will; in fact, the trial justice specifically found that Dorothy "intended to provide living quarters for [the] plaintiff after her death." Again, when the will is read in its entirety, Dorothy's concern for Robert's continued well-being and her appreciation for his forty years of fidelity become even more manifest. She gave Robert a $30,000 legacy, all the furniture and furnishings from Farmer's Cottage (his abode at that time on the farm), a large tractor, and a variety of tools and equipment. In addition, she left explicit instructions in her will (which were repeated in a 1970 codicil) that her executors during the period when the estate was being administered were to pay Robert "so much money as they deem adequate for his proper subsistence and living expenses."

In *Dyal v. Brunt,* 155 Kan. 141, 146, 123 P.2d 307, 310 (1942), the Kansas Supreme Court expressly disapproved the use of the canon relied on by the trial justice in rejecting Robert's claim and pointed out that unwavering adherence to the rule that a devise of a fee may not be impaired by a subsequent contradictory provision has been supplanted by consideration of such matters as the circumstances surrounding the execution of the will, an examination of all the parts of the testamentary instrument, and a discernment of intent from such sources. A year later in *Washington Trust Co. v. Arnold,* 69 R.I. 121, 124, 31 A.2d 420, 421 (1943), this court, in construing a controversy somewhat similar to that now before us,

emphasized the necessity of determining intent from an examination of the "whole will," stating that "where the testator has used certain technical words of limitation in describing a devise and bequest, such words will be given their ordinary meaning and effect as at common law, unless a contrary intent is clearly manifested by the testator elsewhere in the will." In other words, once a fee is given to a person in a will, the fee will not thereafter be taken away or diminished unless the terms clearly demonstrate an intent to limit the prior devise.

■ Taking our cue from what was said in the *Arnold* case, we cannot view the phrase "absolutely and in fee simple" in a vacuum. We are bound to give the language of the will such an interpretation as will carry out Dorothy's intent. In our opinion, any endorsement of the narrow view taken by the trial justice would nullify Dorothy's obvious beneficence to Robert, a result clearly at odds with her manifest intent. It is clear from an examination of the record that not only did Dorothy wish her son to have the ultimate exclusive control of the farm but she also wished her caretaker to be able to live there as he had for forty years. She intended Robert's interest to be limited to his right to have a shelter and comfort in the converted sheep shed known as Resurrection Piece, a place where he could hang his hat as long as he chose if and when the farm was sold. The farm would belong to Dorothy's son, but her caretaker would not be forgotten. Consequently, we are of the opinion that Robert received a right by Dorothy's will to occupy Resurrection Piece once the farm had been sold and that the devise to him is valid and enforceable.

In reaching this conclusion, we are not unmindful of Horace's argument that Robert's "executory interest * * * is violative of the rules at common law and, therefore, is null and void." He describes Robert's executory interest as "a future interest created in one other than the grantor which is not a remainder" but "vests upon the happening of a condition or event and in dero-

gation of a vested freehold estate." *Presbyterian Church of Carlyle v. St. Louis Union Trust Co.,* 18 Ill.App.3d 713, 719, 310 N.E.2d 412, 417–18 (1974). Horace, after citing G.L. 1956 (1969 Reenactment) § 34–4–11, which in its pertinent portion specifically authorizes the disposition by conveyance or will of any "executory * * * interest * * * in any tenements or hereditaments of any tenure," claims that Robert's interest is neither a hereditament, because it cannot be the subject of inheritance, nor a tenement, because it is not "an estate in land." Horace describes Robert's interest as a "bare personal right to residential use."

Much has been written about the quantum of an estate or interest created by an instrument that purports to establish certain premises as a home for one or more designated individuals. Many cases dealing with this issue can be found in Annot., 45 A.L.R.2d 699 (1956). There is no general rule that can be applied to these controversies because of the variety of interests as well as the number of qualifications, limitations, and conditions which may be created. Some courts have proceeded on the theory that something less than a life estate has been created, whereas others have found a life estate.

The mere personal-privilege-of-occupancy theory espoused by Horace finds support in *Winters National Bank and Trust Co. of Dayton v. Shawen,* Ohio Misc., 205 N.E.2d 135 (Ohio Pr.Ct.1964). However, this court in *Chamberland v. Goldberg,* 89 R.I. 223, 226–27, 152 A.2d 219, 221 (1959), found a life estate in a situation in which a property owner executed a document (not a will) in which he asserted, " 'It is my express wish that the tenement now occupied by Sylvio J. Chamberland at 1196 Smithfield Avenue in the town of Saylesville, Lincoln should be rent free to him as long as he occupies these quarters, for his own personal use.' " In *Disley v. Disley,* 30 R.I. 366, 75 A. 481 (1910), shortly after the turn of the century, it was noted that although a life estate is not an estate of inheritance, it is a freehold estate. Consequently, we look upon the tenement-hereditament verbiage of § 34–4–11 as being inclusive rather than exclusive in that it sanctions the use of those two categories as being, along with other interests, proper subjects for disposition as an executory interest by way of a deed or will. Although it may not be an everyday occurrence, we see no reason why an executory interest following the creation of a fee cannot be a life estate. Simes and Smith, *The Law of Future Interests* § 225 (2d ed. 1956). Thus, Robert's interest in the premises known as Resurrection Piece is carved out of Horace's fee-simple interest, but the divestiture merely goes to the extent that is necessary to effectuate the grant of Robert's executory interest. *Medcalf v. Whitely's Adm'x,* 290 Ky. 94, 160 S.W.2d 348 (1942).

My Brother Shea cites several cases to buttress the proposition that courts generally disfavor conditions on a testamentary devise which restrain alienation. However, this proposition is not unqualified. The court in those cases first found that absolute fees were conveyed and then determined that subsequent restraints on alienation were repugnant to the testators' intent. *See Goffe v. Karanyianopoulos,* 53 R.I. 313, 166 A. 547 (1933); *Perry v. Brown,* 45 R.I. 210, 121 A. 209 (1923); *Manierre v. Welling,* 32 R.I. 104, 78 A. 507 (1911). Under the rule enunciated in *Manierre,* repugnant restraints on alienation are determined by measuring their scope and effect. Limited restraints that do not substantially diminish the whole power of alienation are not necessarily void. Here, our ultimate objective in measuring the scope and effect of the restraints on alienation is to arrive at the intent of the testator.

Upon a full examination of the will in light of the attendant circumstances discussed above, we have concluded that Dorothy intended to provide Robert with a place to call home in the event that the farm was sold. This manifest intent effectively nullified the phrase that purportedly conveyed an absolute fee simple to Horace. We have said previously that the law does not prohibit an estate's being tied up for the life of any one individual. *Industrial National*

*Bank of Rhode Island v. Barrett,* 101 R.I. 89, 99, 220 A.2d 517, 524 (1966). Robert's executory interest is limited to a life estate in a converted sheep shed. This limited interest does not impose an unreasonable or absolute restraint on Horace's right to alienate the property. Consequently, it is neither repugnant nor void.

In conclusion, we must reject Robert's contention that he had a right to continue to live in Farmer's Cottage after Dorothy's death and up until the sale of the farm. According to Robert, after the farm was sold, he would then move into Resurrection Piece and free up the cottage for a new caretaker. Perhaps Dorothy never envisioned the end of Robert's and Horace's forty-year friendship, but our task is to construe wills, not to redraft them. *Egavian v. Egavian,* 102 R.I. 740, 751, 232 A.2d 789, 795 (1967). Consequently, we cannot recognize any right of Robert's to continue to live in Farmer's Cottage once Dorothy had died.

Robert's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for entry of a judgment in accord with the dictates of this opinion and for consideration of Robert's claim for damages.

SHEA, Justice, dissenting.

I dissent. The clearest expression of intent in Mrs. Beck's will, defining the nature of the estate she intended to leave Horace P. Beck, Jr., is contained in the language that devised "Bateman Farm" to Horace "absolutely and in fee simple." In view of this clear expression of intent, I cannot join in the majority's conclusion that the testatrix did not intend to leave her son a fee simple absolute.

The later language in the will, purporting to devise a life interest to Robert Adams Chile upon the occurrence of a condition precedent is completely at odds with the devise to Horace. Faced with such a contradiction, this court should apply in such cases our well-settled rule of testamentary construction which provides that when a testator has made a gift of land in fee simple absolute, a subsequent provision inconsistent with the absolute nature of that gift is held to be a repugnant provision and is treated as void in law. *E.g., Rhode Island Hospital Trust Company v. City of Woonsocket,* 48 R.I. 345, 137 A. 411 (1927).

To promote stability in the law, courts generally have adopted a policy of leaving settled rules of law undisturbed. Adherence to this policy is particularly essential in the area of will and trust law where individuals rely on established legal guidelines to draft accurately instruments that will effectively dispose of their estate at a time when they will no longer be present to speak their desires.

This need for providing certainty in such an important area of law is more compelling than is satisfying what we now suspect to be the testatrix's desire when that desire is expressed in a way that is unenforceable according to settled law. For these reasons, prior opinions of this court have adhered to the settled principles of testamentary construction when reaching a decision in this type of case.

In the case of *Re Will of Henry C. Kimball,* 20 R.I. 619, 40 A. 847 (1898), a gift of the residuary estate was made to the testator's daughters absolutely but subject to a later provision that the daughters should only receive income during their minority. The court found that an absolute power of disposition was in the daughters and therefore the subsequent limitations were rendered repugnant and void. In *Wood for an Opinion,* 28 R.I. 290, 67 A. 8 (1907), the testatrix left her residuary estate to her husband "unconditionally," with any remainder after his death to the testatrix's sisters. Again the court held that the first clause created a fee simple absolute and voided the second clause for repugnancy.

In *In re Petition of William C. Howard for an Opinion,* 52 R.I. 170, 159 A. 143 (1932); *Rhode Island Hospital Trust Co. v. City of Woonsocket,* 48 R.I. 345, 137 A. 411 (1927), and *Cahill v. Tanner,* 43 R.I. 403, 113 A. 289 (1921), the testators left the residue of their estates to named individuals "for-

ever," which language was followed by clauses attempting either to give away the remainder upon the beneficiary's death or to establish a trust if the beneficiary had not yet attained the age of twenty-one. In each of these cases the court found that the language in the first clause clearly indicated that the testator intended to devise a fee simple absolute interest. Because the subsequent language was repugnant to the absolute nature of the first gift, it was treated as void.

The above cases, and this devise to Horace Beck, contain clear and unequivocal language in the first clause indicating the absolute nature of the gift. The use of the words "absolutely," "unconditionally," "forever," and "absolutely and in fee simple" has always been sufficient to accomplish this.

In each of the cases in which this court has found less than an absolute gift in the first clause, it was not clear from the language used whether the testator intended an absolute gift. This failure to employ language sufficient to create an absolute gift permitted the implementation of the second gift. For example, in *Billings v. Gladding,* 58 R.I. 218, 220, 192 A. 216, 217 (1937), the will stated, "I give devise and bequeath to my husband * * * all of my real estate * * * and after his decease, the remainder to my niece * * *." In this instance the court held that the language did not unequivocally create a fee simple. Instead, the court looked to the use of the term "remainder" to indicate an intention to limit the nature of the gift. In *Lux v. Lux,* 109 R.I. 592, 288 A.2d 701 (1972), the testator left the residue of his estate "to my grandchildren, share and share alike." This was followed by a provision indicating that any real estate included in the residue could not be sold until the youngest grandchild reached the age twenty-one. This court found that when the residuary clause was viewed in its entirety, it was clear that the testator did not intend the grandchildren to take the property in fee simple. The distinguishing feature between these two cases and those discussed earlier is the absence of language indicating a clear intention to make the gift absolute.

Mr. Chile and the majority place great reliance on *Washington Trust Co. v. Arnold,* 69 R.I. 121, 31 A.2d 420 (1943), because it is the only case cited in this jurisdiction that does not fit neatly into one or the other part of the above dichotomy. In *Arnold* the testator left the residue of his estate to his wife "forever, subject to the following conditions." The court noted that whereas the use of the term "forever" is ordinarily adequate to vest the gift in fee simple absolute, the language, which was contained in the same sentence, taken in its entirety manifested a contrary intention. That contrary intention was to annex certain specified conditions and qualifications to the gift. *Id.* at 124, 31 A.2d at 421–22. However, this holding, as I read it, is not controlling in the present case. In *Arnold,* to find the testator's dominant intent, the court reasoned as follows:

"Immediately following and clearly qualifying the words 'to her, her heirs and assigns, forever', he used the significant language, 'subject to the following conditions'; and then he continued by enumerating certain conditions and powers that plainly qualify the gift." *Id.* at 125, 31 A.2d at 422.

The court stressed its reliance on the proximity to the gift itself of the language annexing conditions when it distinguished cases that found an absolute fee voiding the subsequent language.

"[T]he first gift was actually intended and made subject to express conditions or qualifications that appear in the same sentence, and * * * the absolute and unrestricted right to dispose of the property was not given to the first taker, expressly or by implication." *Id.* at 127, 31 A.2d at 423.

That is not the case with Dorothy Bateman Beck's will. There is no language immediately annexing express conditions to the gift to Horace Beck "absolutely and in fee simple." Therefore, the attempted gift to Mr. Chile contained in the subsequent language should fail because it is entirely re-

pugnant to the absolute nature of the devise to Horace Beck. Under prior decisions of this court, the language purportedly creating the life estate is void in law. Consequently, Mr. Chile, in my opinion, did not acquire any interest in Resurrection Piece.

Finally, it is clear from the record that Mrs. Beck intended her son to have the ultimate exclusive control of the farm. She so provided in her will by language devising Bateman Farm to Horace "absolutely and in fee simple." The majority has apparently accepted this interpretation. They state that Robert Chile did not receive a right to continue to live on the premises once Dorothy Bateman Beck died, and only "if and when this farm is sold" would he be entitled to occupy Resurrection Piece. Their determination that this devise becomes operative only in the event the farm is sold is troublesome because, in effect, it validates a restraint upon alienation of the Bateman Farm. It is generally held that any provision in a legal instrument which would tend to impair the marketability of property is a restraint upon alienation. Simes and Smith, *The Law of Future Interests* § 1111 (2d ed. 1956). Also, it is quite well established that restraints on the alienation of realty that is the subject of a devise are generally disfavored at law. This court has construed such a restraining condition void as against public policy. *See Goffe v. Karanyianopoulos,* 53 R.I. 313, 166 A. 547 (1933); *Perry v. Brown,* 45 R.I. 210, 121 A. 209 (1923); *Manierre v. Welling,* 32 R.I. 104, 78 A. 507 (1911). Here, Horace, although given all the incidents of ownership of the Bateman Farm, in effect is precluded from selling the property free and clear since any subsequent owner would be required by the majority's decision to allow Robert Chile to live on the premises.

Although this restraint may be of limited duration—at most, the remaining years of Mr. Chile's life—this court has indicated that a limitation in duration does not itself make a restraint valid if it otherwise is so general in scope or effect as to operate as a substantial restraint. *Manierre v. Welling,* 32 R.I. at 115, 78 A. at 512. The restraint in this case although not absolute, is still substantial, for even though it is arguably possible to find an individual willing to purchase the farm under this condition, it is practically an improbable result. The law is concerned primarily with practical alienability, not with a theoretical power of alienation. The rules in this area tend primarily to further practical alienability. Simes and Smith, *supra,* at § 1115. Therefore, to give effect to this provision in Dorothy Bateman Beck's will, as the majority has done, is to impose a substantial restraint on alienation of the Bateman Farm. Such a result is inconsistent with our prior case law as well as with the generally established legal doctrine in this area.

For the foregoing reasons, I would affirm the judgment entered in the Superior Court.